CoweN, Chief Judge,
delivered the opinion of the court:
Plaintiff, a former Army Reserve officer, sues to recover disability retirement pay commencing either from the date of his release from active duty in May of 1954, or from the date he suffered a myocardial infarction while on a 15-day active Reserve tour of duty in August of 1957.
*368 Plaintiff was appointed 2nd Lieutenant, CXBC, on September 8,1937, and served on active duty from April 21,1941 to April 23,1946, successively as a 1st Lieutenant, Captain, and Major. From April 24 to October 13, 1946, his status was that of a Major in the Reserves. On October 14,1946, he was recalled to active duty in the grade of Major, and subsequently was promoted to Lieutenant Colonel. On May 31,1954, while serving as Lieutenant Colonel, he was relieved from active duty by reason of denial of category renewal, and according to the Army records, not by reason of physical disability. Plaintiff then received a commission as Major in the Army Reserve, in which capacity he served until he was honorably discharged on- April 28,1960, due to physical disqualification.
In December of 1943, while on active duty, plaintiff experienced the discomforting effects of sacroiliac strain, the first important instance in a series of various illnesses which have plagued him intermittently to the present date. In 1948 further strains of the sacroiliac joints were evidenced and plaintiff was treated, as before, by diathermy. Later in that year he was hospitalized for “right upper quadrant tenderness,” and diagnosed as having chronic cholecystitis or inflammation of the gall bladder. In November of 1950 he was hospitalized for bursitis of the left shoulder, and in May of 1951 for infectious hepatitis and jaundice. At the end of May 1951, his gall bladder was surgically removed in Okinawa. Later in the same year he complained of a certain amount of chest pain. In February of 1953, he was again hospitalized with bursitis. In January.of 1954, he was transferred at his own request from an infantry training task to an administrative job, and in March of that year he received outpatient treatment for headaches and dizzy spells. Two electrocardiograms then administered proved to be negative. In April 1954 plaintiff was scheduled for release from active duty, due to change of category. His request for a continuation of active duty was denied, and he was consequently released as anticipated on May 31,1954. . •
A final type physical examination conducted at Camp Polk, Louisiana, on May 25, 1964, to determine plaintiff’s physical qualification for release, found him to be fit and *369 qualified for general military service, with, a physical profile of Pll'llll.[1] The Report of Medical History accompanying the examination took note of plaintiff’s past ailments and complaints, including his gall bladder removal, back pains, stomach and liver disorders, headaches and dizziness, chest pains, bursitis, and sacroiliac strain.
Upon his release from active duty, plaintiff was reassigned to the Reserves and obtained civilian employment of an administrative nature. Pie continued, as he had before separation from active military service, to complain of various stomach and back disorders. From March 3 to March 7, 1955, he was hospitalized, and an examination disclosed a duodenal ulcer and pancreatitis.
On April 1, 1955, plaintiff tried to enlist in the Regular Army, but was found physically unfit for entry on duty as an enlisted man, with a physical profile of P411121, temporary. From August 6 to August 20,1955, he was ordered to active duty as a Reserve officer, and in connection with that tour of duty, he represented that he considered himself sound, well, and fit for full military duty, citing the favorable physical rating he had received one year earlier upon his separation from active duty. On May 9, 1955, the Veterans Administration rated plaintiff 10 percent disabled, effective June 1,1954, as a result of the residual effects of his gall bladder removal. No disability rating was awarded on account of the ulcer or pancreatitis. On January 25, 1956, plaintiff again tried to enlist in the Regular Army and was once more found unfit for entry on regular military duty, with a profile of P411111, permanent, due to chronic pancreatitis.
Three days later, on January 28, 1956, plaintiff applied to the Army’s Board for Correction of Military Records, claiming that he should have been found physically disabled at the time of his release from active duty on May 31, 1954. In his application, plaintiff based his claim to disability principally on his gall bladder removal and post-operative pains and on his March 1955 ulcer and pancreatitis, alleging *370 that the latter existed prior to separation. Plaintiff stated, moreover, that he had orally requested a physical evaluation board at the time of separation, but that defendant’s officials had deemed this action inadvisable.
On March 19,1956, the Correction Board referred the case to the Surgeon General’s Office for comment and opinion as to whether plaintiff’s physical condition upon release from active duty was such as to require retirement for physical disability. In reply, the Surgeon General stated that there could, of course, be no doubt as to the existence of gall bladder disease in the case but that the records did not substantiate the presence of an ulcer or pancreatitis at the time of separation. Notice was taken of the discomforts that plaintiff suffered subsequent to his gall bladder operation, but it was pointed out that there was no indication that he sought aid or relief at any Army medical facility for these symptoms. In conclusion, the Surgeon General expressed the opinion that at the time plaintiff was released from active service, the records indicated that he had no condition which would have warranted his retirement by reason of physical disability under the pertinent statutes and regulations then in force. Plaintiff’s request for a hearing was denied and the Correction Board refused to alter his records.
Plaintiff served on his normal annual active Reserve duty from June 17 to July 1,1956, but the Chief of Medical Service determined on June 29, 1956, that he could do no duty. On July 20, 1956, plaintiff requested the Army Correction Board to reconsider his application in light of this latest development and urged the Board to consider his unsuccessful attempts to enlist in the Regular Army and his 10 percent disability rating from the Veterans Administration. However, on July 24, 1956, 4 days after filing the request, plaintiff completed an Army Reserve Qualification and Availability Questionnaire in which he indicated his availability for active military duty. No mention was made of any physical defect which would have precluded such service. On December 17,1956, after a review of the additional evidence submitted, the Correction Board denied plaintiff’s request for reconsideration of the case.
*371 Shortly after the second denial of relief by the Correction Board, plaintiff went on a short tour of duty to attend the National Resources Conference, certifying at the time his fitness for active duty. On July 20, 1957, plaintiff entered his normal 1'5-day active Reserve tour of duty at Fort Meade, Maryland, after once more certifying his physical qualification. On August 2,1957, while performing this tour of duty, plaintiff sustained a myocardial infarction for which he was hospitalized in Army facilities until October 4, 1957. (A more detailed description of this illness and its relevant consequences will be found later in this opinion, in conjunction with the second count of plaintiff’s claim.) On September 28, 1957, while a patient at the Walter Reed Army Hospital, plaintiff filed a third application with the Board for Correction of Military Records, again alleging his physical disqualification as of May 31,1954. All of plaintiff’s major illnesses were listed in the request, with particular emphasis laid on his 1951 gall bladder removal, his 1955 pancreatitis, and his 1957 myocardial infarction. On April 28,1958, plaintiff was notified that his request for reconsideration had been denied because the Board, after again considering the records of the case, including those relevant to his hospitalization following the myocardial infarction, had found no basis for a formal hearing or for an alteration of the records.
Thus, three times plaintiff applied to the Army Board for Correction of Military Records, requesting that his records be changed to show his physical disability and consequent entitlement to disability retirement pay as of May 31,1954, the date of his separation from active military service. Three times that administrative body refused to grant the relief requested. Plaintiff, of course, attacks the decisions of the Army as arbitrary and unjustified by the medical records and evidence in the case, and asserts that if a physical evaluation board had been convened upon his oral request and had competently and comprehensively examined him just prior to his release from active duty, it would have found him physically disqualified to perform general military service at that time.
This court has held on many occasions that it has no power to review the decisions of the Secretary of one of the military departments or his authorized representatives in such *372 a case unless the petitioner shows by .cogent and clearly convincing evidence that such determinations are arbitrary, capricious, or not supported by substantial evidence, Furlong v. United States, 153 Ct. Cl. 557 (1961); Wales v. United States, 132 Ct. Cl. 765, 130 F. Supp. 900 (1955); Boland v. United States, 169 Ct. Cl. 145 (1965). The court will not substitute its judgment for that of the armed services in determining general fitness for military duty. Furlong v. United States, supra; Johnson v. United States, 138 Ct. Cl. 81, 149 F. Supp. 648 (1957), cert. denied, 355 U.S. 850 (1957); Woodford v. United States, 138 Ct. Cl. 228, 151 F. Supp. 925 (1957), cert. denied, 355 U.S. 861 (1957).
In the case at hand, plaintiff on three occasions requested the Army Board for Correction of Military Records to alter his records to reflect physical disability as of May 31, 1954. In considering each of these applications, that body had before it plaintiff’s entire relevant military medical history, including his various hospital clinical records and the report of his separation physical examination. Also before the Board’s attention were numerous affidavits and records relating to plaintiff’s post-separation illnesses and discomfort. After reviewing all the evidence presented and taking into account the memorandum opinion prepared upon request by the Surgeon General’s Office, the Board reached the considered opinion that plaintiff had not established sufficient basis to justify a formal hearing or further action in the case.
Plaintiff attacks the decision of the Board as untenable and contrary to the evidence on the grounds that he was not referred to a physical evaluation board upon release, that he was rated 10 percent disabled by the Veterans Administration as of June 1,1954, that he was subsequently found unfit for entry on active duty as an enlisted man, and that he suffered numerous and allegedly related ailments after separation. We are unable to agree with plaintiff’s contention that the recited facts establish that the Army acted arbitrarily in his case. First of all, the nature, number, duration, and severity of plaintiff’s disabilities while in service, as disclosed by his official medical records and the results of his final type physical examination, were not of such obvious character as *373 to require an evaluation in May of 1954 by a physical evaluation board to determine his physical fitness to perform his duties. Compare Lawler v. United States, 169 Ct. Cl. 644 (1965). Secondly, the fact that plaintiff was denied enlistment in the Kegular Army subsequent to his release from active duty as an officer is of itself immaterial, for the standards imposed for original appointment are more stringent than those for retention on active duty. Towell v. United States, 150 Ct. Cl. 422 (1960); Furlong v. United States, supra. The fact that the Veterans Administration gave plaintiff a disability rating of 10 percent does not entitle him to recover, because the Army, in making its determination as to whether an officer is entitled to disability retirement pay, is not bound by action taken by the Administration operating under a separate statute. See Holliday v. United States, 128 Ct. Cl. 647 (1954); Johnson v. United States, supra; Wales v. United States, supra. In any event, 10 U.S.C. § 1201 expressly states that a disability rating must be at least 30 percent to be of any relevance. Finally, the evidence brought forward by plaintiff concerning his post-separation illnesses, particularly his 1955 pancreatitis and his 1957 heart condition, is not sufficient when considered in connection with all the evidence before the Correction Board to establish that the Board’s action was arbitrary or capricious.
Although plaintiff’s counsel has eloquently pleaded his cause and has introduced a great deal of documentary evidence to confirm the fact that plaintiff suffered and complained of several illnesses both before and after his release from active duty, plaintiff has not sustained' the substantial burden of showing that the Secretary of the Army, through his designated representatives, violated his legislative mandate by arbitrarily denying to plaintiff the' disability retirement pay he now claims. The record in the case does not warrant the conclusion that the personnel involved ignored relevant and' competent evidence, that they unreasonably construed the significant body of medical documents before them, or that in any other manner they failed to discharge their designated duties. It must be noted that not all ailments or disabilities are incapacitating to the extent of justi- *374 fyin g retirement by reason of physical disqualification. Wales v. United States, supra.
In reviewing plaintiff’s entire military records and the reports of his post-separation illnesses insofar as they •related to his condition while in active service, the Army reached the reasonable conclusion that plaintiff was physically qualified for duty at the time of his release. Such a determination of physical fitness is to be made in the first instance by the Army and not by the court; and as noted above, it will be upheld unless affirmatively shown to be arbitrary, capricious, unsupported by substantial evidence, or in noncompliance with applicable laws and regulations. Johnston v. United States, 157 Ct. Cl. 474 (1962); Towell v. United States, supra; Furlong v. United States, supra; Wales v. United States, supra; Woodford v. United States, supra. The decision of the Correction Board, affirming the prior official determination of the Army that plaintiff was physically fit and qualified to perform the duties of his office, grade, rank, or rating at the date of his release from active duty on May 31,1954, is adequately supported by the medical records in the case.
Plaintiff’s second claim to relief is based on the fact that he sustained a heart attack while on a short tour of active Reserve duty. 10 U.S.C. § 1204 provides for disability retirement in the case of members of the armed services who. have served on active duty for a period of 30 days or less (as compared to 10 U.S.C. § 1201 which concerns members on extended tours of active service). Section. 1204, however, requires that the physical disability complained of must have resulted from an “injury.” Plaintiff, consequently, alleges that the myocardial infarction he sustained on August 2,1957, while on a 15-day tour of active duty was indeed such an “injury.” Defendant, on the other hand, maintains that a myocardial infarction is a “disease,” and not an “injury” as required by the statute.
This is not the first time that the particular issue has been presented before the court. In Gwin v. United States, 133 Ct. Cl. 749, 137 F. Supp. 737 (1956), we held as a matter of common parlance and of statutory interpretation that a myocardial infarction is a “disease,” and not of itself an “injury” within the purview of 10 U.S.C. § 1204. See also Rae v. *375 United States, 159 Ct. Cl. 160 (1962). There are no convincing factors which would induce us to reach a contrary conclusion in the present case. While on his scheduled 15-day tour of duty plaintiff exerted himself by playing tennis and by climbing stairs in exceedingly hot weather. The clinical abstract prepared by a Medical Board convened at Walter Beed Hospital on October 1, 1957, where plaintiff was recuperating from the illness in question, indicated that his myocardial infarction was a common manifestation of a slowly developing arteriosclerotic condition, typical of human males and commencing at an early age. The Board was of the opinion that the particular physical activities precipitating the infarction were not of an unusual nature, could not in themselves have been responsible for causing an acute coronary occlusion and that the infarction was probably one of the ordinary instances and complications occurring in the course of a coronary disease. The Board also stated that plaintiff’s diagnosed arteriosclerotic condition probably would not have been recognizable upon normal examination as a clinical coronary disease prior to the infarction episode, although it admitted that this conclusion was somewhat speculative in view of plaintiff?s past history of sundry diseases, illnesses, and complaints. The evidence does not show that plaintiff suffered any independent blow or- injury- while on- this active duty tour which would have precipitated the infarction;
In summary, the defendant’s determination that the myocardial infarction sustained by plaintiff on August 2, 1957, was a manifestation of a pre-existing arteriosclerotic heart disease rather than an “injury” has not been shown to be arbitrary, capricious, or unsupported by substantial evidence.
Plaintiff makes an argument in his brief to the effect that the 1957 tour of active duty during which he suffered his myocardial infarction extended in fact for more than 30 days. It is contended, first of all, that since he was hospitalized until October 4, 1957, and received active duty pay during this period, his tour of duty can be said to have actually lasted from July 20, 1957 to October 4, 1957, and not merely to August 5, 1957, as scheduled. As was pointed out in the Gwin case, which is strikingly similar to the present case on its facts, the legislative history of the Career Compensation *376 Act of 1949 (now codified as 10 U.S.C. §§ 1201 et seq.) shows that Congress did not intend to award disability retirement to persons wlio were disabled by disease while serving on short tours of active duty. Hence, to permit an officer who has been hospitalized by reason of disease while on a 15-day tour of duty to automatically add the period of his hospitalization to that of his active duty as originally scheduled for the purpose of qualifying for disability retirement would in effect ignore the carefully worded distinction which Congress drew between Sections 1201 and 1204 of Title 10. Gwin v. United States, supra. The fact that Army policy provided for the payment of active duty pay during periods of hospitalization does not alter this result. Plaintiff would, in any case, still be considered to have served on a 15-day tour of duty for purposes of the statute, regardless of the extent or duration of his hospitalization.
In connection with his hospitalization, plaintiff also contends that he has remained on active duty status continuously from July 20,1957, until the filing of the petition here, on the grounds that he was never issued formal orders rescinding his prior orders and specifically relieving him from active duty. Plaintiff was processed under the provisions of Section 15 of AE 40-212 (which deals with procedures following medical board action in the case of reservists on active duty training) and was eventually released from the hospital and returned to his home. Plaintiff has pointed to no authority, and we know of none, to substantiate the legal proposition that a formal order, other than the procedure outlined in the above regulation, specifically relieving the member from active duty, is required to be issued upon discharge. Plaintiff was separated in accordance with the applicable Army regulations, and there is no merit in the contention that he has remained on active duty status continuously since July 20, 1957.
In view of our conclusions, stated above, plaintiff is not entitled to recover and his petition is dismissed.
FINDINGS OP. PACT
The court having considered the evidence, the report of Trial Commissioner Eobert K/McConnaughey, and the briefs *377 and arguments of counsel, makes findings of fact as follows:
,1. The plaintiff was appointed 2nd Lieutenant, OEC, September 8,1937. He entered on extended active duty April 21, 1941, as a 1st Lieutenant, Infantry, OEC, and was subsequently promoted to Captain, AUS, and Major, AUS. He was relieved from active duty on April 23, 1946, by reason of demobilization and not by reason of physical disability, while serving as Major, AUS. His status from April 24 to October 13,1946, was Major, AUS, and Major, Armor, OEC.
2. (a*) On October 14, 1946, the plaintiff was recalled to active duty in the grade of Major, AUS, and subsequently was promoted to Lieutenant Colonel, AUS. On January 19, 1953, he was appointed Major, Infantry, United States Army Eeserve. On May 31, 1954, while serving in the grade of Lieutenant Colonel, AUS, he was relieved from active duty by reason of denial of category renewal and, according to the Army records, not by reason of physical disability. His commission as Lieutenant Colonel, AUS, terminated on May 31, 1954.
(b) Beginning about a year and a half later, after an illness involving symptoms attributed in part to residuals of a gall bladder removal in 1951, the plaintiff has persistently asserted, through a succession of communications with representatives of the defendant, that his physical condition was not properly evaluated at the time of his separation May 31, 1954, in that his final type physical examination at that time did not receive clinical evaluation by a medical officer or medical board, whereas he has believed that it should have received such evaluation in view of the evidence of prior illnesses, symptoms, and complaints apparent in his prior record, and confirmatory significance of subsequent illnesses and symptoms, and that, if his medical history and symptoms had been properly evaluated in 1954, they might have disclosed physical ailments which later were manifested in more acute form. The failure of his repeated efforts to accomplish the desired correction of his medical record or to procure a hearing on his applications for its correction eventually led to this suit.
3. (a) On August 27, 1954, the plaintiff was appointed Lieutenant Colonel, Infantry, United States Army Eeserve, *378 and was honorably discharged from that commission on April 28,1960, by reason of physical disqualification, following hospitalization for a myocardial infarction which occurred August 2, 1957, while he was at Fort George G. Meade, under orders for duty between July 20 and August 5, 1957, as part of the annual USAR training program.
(b)Since the myocardial infarction, he has claimed that the processing of his release from hospitalization following that illness resulted in extending his active duty in July and August 1957, beyond the less than 30-day period originally designated, and, in the alternative, that disability attributable to the myocardial infarction should be regarded as a disability resulting from an injury incurred while on active duty, or that, in view of his record of prior symptoms, most notably chest pains experienced in 1951 while on duty in Okinawa, the conditions that culminated in the myocardial infarction in 1957 may have been present in May 1954 and might have been discovered then had his condition been properly evaluated before his release from active duty. He asserts these claims here, in addition to the claims described in finding 2(b).
4. (a) On November 27, 1946, the plaintiff applied for appointment in the- Regular Army, but was rejected because of the necessity for a balanced age and grade distribution.
(b) On July 7, 1955, he applied for appointment as a Warrant Officer, AUS, but was not favorably considered for such appointment because he was found not professionally qualified. '
(c) On October 8, 1956, he was found not qualified for enlistment in the Regular Army by reason of chronic pan-creatitis, and
(d) On February 20, 1957, his application for appointment in the Regular Army was rejected because of failure to meet the age qualification.
5. The plaintiff’s Army medical records both before and after May 31, 1954, show that he suffered a succession of physical complaints, misadventures, and treatments from time to time, beginning as early as December 14,1943, when he was admitted to the Orthopedic Clinic at Fort Custer, Michigan, by reason of complaints of “sacro-iliac strain, *379 recurrent.” He was excused, from marching, hiking, formation, and judo training, and was treated by heat and massage, once a day, until December 22, 1943.
fi. In January 1948, he was treated by diathermy for “sacro-iliac joints, strained” at the Valley Baptist Hospital at Harlingen, Texas. The cost of one office call to a doctor’s office, and nine diathermy treatments at the hospital between January 9 and 15,1948, was paid by public voucher.
7. The plaintiff had a final type physical examination on March 17, 1948, through which he was found fit for general service and which, in common with reports of previous final type physical examinations dated October 9 and 28, 194(3, January 8,1947, and March 14,1947, show—
Heart — normal; Arteries — normal; Bones and J oints — Muscles—N ormal.
8. (a) On August 8, 1948, he was admitted to the Army and Navy General Hospital at Hot' Springs, Arkansas, for “right upper quadrant tenderness.” 'He was placed on a modified regime and, upon examination, the gall bladder showed a nonfunctioning type. His physical classification was considered by a Disposition Board which convened at the hospital on September 29,1948. The Disposition Board found that he had a cholecystitis, chronic, with a superimposed cholelithiasis, but, because he had suffered no prior attack of gall bladder disease, it was recommended that surgery be deferred until the latter part of 1948 or early 1949. After a 30-day leave, he was recommended by the Disposition Board for general service and he returned to duty with that physical classification.
(b) Eventually, in the latter half Of May 1951, while on active service with the Far East Command in Okinawa, his gall bladder was surgically removed. Exploratory procedures had disclosed that the plaintiff had translucent stones.
9. Meanwhile, about November 18, 1950, while on duty in Okinawa, he was hospitalized and determined to have bursitis of the left shoulder and other symptoms. He was released from hospitalized status January 25-26, 1951.
10. May 15, 1951, he was again hospitalized due to diagnosis of infectious hepatitis. There was an additional diagnosis of jaundice on May 9,1951. He was released to limited *380 assignment under physical profile P311111, “to return to the hospital on all clear.”
11. Thereafter, following his gall bladder operation, later in May 1951, which is described in finding 8 (b), the plaintiff was on convalescent leave from June 4 through June 19, 1951, and, on his release from the hospital, was given a physical profile of Pllllll, on June 19, 1951, which was restated November 1, 1951.[1]
12. In 1951, before the physical profile of November 1, 1951, the plaintiff complained of chest pains and the complaint was entered in his official medical record.
13. In December 1952, after he had returned from the far east, in a letter in which he mentioned that he had had considerable illness while in the Far East Command, he expressed a preference for an assignment to Europe instead of to an infantry training division at Camp Polk, Louisiana.
■14. In January 1953, he was refused hospitalization by the dispensing officer at Fort Benning, Georgia, but he was hospitalized from February 4-11, 1953, shortly after his arrival at Camp Polk, Louisiana. Following a 72-hour battalion training test at Camp Polk, he was treated for bursitis of the left shoulder. While he was at Camp Polk, his condition and his complaints were observed by an officer member of his organization.
15.. On October 1, 1953, the plaintiff applied to the War Department for a renewal, for 3 years, of his Category III which was due to terminate May 31, 1954, unless renewed. On November 16, 1953, his application for renewal of Category III, which included a declination of a new category, was not favorably considered by the Secretary of War.
16. In January 1954, he was relieved of all duty and assignment with an infantry unit and was assigned to an administrative desk with routine duties.
17. (a) On March 4,1954, he was admitted for outpatient treatment while on duty at Camp Polk on- complaints of occasional headaches.
*381 (b) He appeared again for outpatient treatment on March 30,1954, complaining of a pain in the left side of his neck and dizzy spells. Pursuant to the request of the Dispensary Surgeon, he was given an electrocardiogram (EKG) on March 30, 1954, and again on March 31, 1954, both with negative results. The pertinent portions of the final outpatient card, dated April 8, 1954, stated:
Patient has long standing history of KUQ* pain. Gall bladder removed in May 1951. Pain has recurred just as severe & as often as before surgery. . . . Liver tests done this week are all normal. To have GI series & Urinalysis. Imp — (Impression) No organic disease.
(c) In March 1954, the plaintiff was told by the Camp Polk hospital commander that a physical evaluation board was appropriate, but was referred to the Chief of the Medical Service.
18. (a) The two electrocardiograms, described in finding 17 (b), made on March 30 and 31, 1954, were the only ones made of the plaintiff while he was on active extended duty.
(b) There is no evidence that an electrocardiogram was done as part of the plaintiff’s final type physical examination at the time of his separation at the end of May 1954 and there is no reference in the record of that examination to previous electrocardiograms.
(c) Under AN 40-100, an electrocardiogram is required in final type physical examinations only if the person being examined is at least 40 years of age, or if his history or physical examination indicates a need for it.
19. (a) On April 13,1954, while at Camp Polk, the plaintiff asked the Adjutant General for reconsideration of his application for category renewal, enclosing 13 documents generally described as “merely a partial basis upon which applicant feels an equitable, just, and comparable overall evaluation should be the subject of review.” In the concluding paragraph, the plaintiff, anticipating that the prior disapproval would be affirmed, requested acceptance of his “unqualified resignation from commissioned status effective 31 May 1954.” On April 15, 1954, this request was sent to the Commanding General, IY Army, Fort Sam Houston, San *382 Antonio, Texas, and on April 20, 1954, Headquarters, IV Army, Fort Sam Houston, Texas, sent it on to the Adjutant General, Department of the Army, with the following notation:
."Recommend approval for the Commanding General.
Jack T. PiNK
Major, AGC, Asst. Adj. Gen.
(b) The plaintiff’s 1954 application for category renewal was not favorably considered.
20. (a) On May 25, 1954, the plaintiff was given a final type physical examination at Camp Polk to .determine his physical qualification for release from active duty for failure of category renewal. The Report of Medical Examination (Standard Form 88) found the plaintiff qualified for military service with a profile of lililí, and with a physical category of A. His blood pressure at this examination was recorded as 120/80.
The Report of Medical History (Standard Form 89), accompanying the physical examination, contains the following entries relevant in this case:
17. Statement of Examinee’s Present Health in Own Words * * *
Fair depending upon frequency of recurring pain in lower right side and upper right portion of back, accompanied by stomach swelling, nausea, indigestion, heart-bum and excessive gas, following gall bladder operation May 1951.
* * * * *
40. Physician’s Summary and Elaboration of All Pertinent Data * * *
* * * Severe headachs, dizzyness with empty stomach frequent dizzyness and gaseous indigestion both before and after choleceptictomy, in 1951. Also has great deal of post cholecystectomy neuralgia. * * * Panting on exertion only, not severe or unusual. Chest pain occasionally on exertion, no predictable, not suggestive of coronary pain. * * * Has worn brace for sacroilliac strain. Bursitis left shoulder and knee. * * * Stomach, liver and intestinal disturbance as well as jaundice on all secondary to cholecystitis and consequent biliary dyskinesia.
*383 (b) The plaintiff’s orders directed that the final type physical examination be accomplished within 72 hours before his relief from active duty on May 31. The examination on May 25 was more than 72 hours before the effective date of the plaintiff’s relief. The Report of Medical History was completed May 28, 1954, after the physical profile was entered. There was no clinical evaluation.
21. Pursuant to orders dated May 25, 1954, the plaintiff departed from his active duty station for home on May 28, 1954, and Ms active duty status was terminated May 31, 1954.
22. Effective June 1, 1954, he was assigned to the 2125th USAR Control Group, in Kentucky, in the grade of Major, Infantry, USAR.
23. After his release from active duty in 1954, the plaintiff obtained civilian employment of an administrative nature, which required little, if any, physical exertion or effort. He continued, as he had before separation from military service, to complain of stomach discomfort, bloating, swelling, and a back condition.
24. He was hospitalized from March 3 to March 7, 1955, and diagnosed as having duodenal ulcer and pancreatitis. He returned to work March 19, 1955.
25. On April 1,1955, he went to Louisville, Kentucky, and tried to enlist in the U.S. Army, but was determined to be physically unfit for entry on duty as an enlisted man. His physical profile serial was then P411121, temporary.
26. On April 8, 1955, he submitted a written inquiry, by letter to a member of the General Staff, Headquarters Department of the Army, regarding grade determination and enlistment. The reply to this letter stated that the Surgeon General’s Office had said that a waiver of its requirements would not be made in the plaintiff’s case.
27. Thereafter the plaintiff was ordered to active duty as an officer, from August 6-20,1955. In connection with that duty, he executed, in accordance with regulations, and without exception, a Physical Certificate on form DD-220, in *384 which, he represented that he considered himself sound and well and physically qualified for full military duty.[2]
28. On July 7,1955, he applied for appointment as a Warrant Officer. On August 30,1955, he underwent a final type physical examination at Fort Knox, Kentucky, and was passed on this physical examination, during which an electrocardiogram was administered. This appointment never materialized, apparently for reasons unrelated to the plaintiff’s physical condition.
29. On January 25,1956, the plaintiff tried to enlist in the U.S. Army, but was determined to be unfit for military duty, and was given a physical profile.serial P411111, permanent, due to chronic pancreatitis. The Eeport of Medical Examination and the Eeport of Medical History were dated the same day.
30. (a) On January 28, 1956, the plaintiff applied to the Board for Correction of Military Eecords claiming to be entitled to have been found physically disabled at the time of his release to inactive duty on May 31,1954. He described his disabilities as gall bladder removal requiring subsequent surgery March 3, 1955, in the form of a laparotomy performed by Dr. William 0. Eobinson. The statement of Dr. Eobinson, dated January 27, 1956, attached, to the application, stated the postoperative diagnosis was that of posterior, penetrating, duodenal ulcer, in addition to acute pancreatitis.
(b) The disabilities asserted by the plaintiff in his January 1956 application to the Correction Board were—
Gall bladder removal with continuing, recurring stomach distress, following, with flatulence, nausea and Eain in lower right quadrant and upper right portion of ack; lumping in upper abdomen with severe pain, culminating in acute sickness- 3 Mar 55, resulting iii diagnosis of duodenal ulcer, major surgery and post operative diagnosis of acute pancreatitis, existing prior to separation. Lower back pain, mild to severe, recurrent, originally diagnosed as “sacro-iliac inflamation,” *385 persisted while in service, and recurring since separation. Bursitis left shoulder with continuous pain originally X-Bayed in Okinawa 1950/51 disclosing two (2) calcified areas. Cramps in stomach muscles when taking mild exercise which results from severance of these muscles when cholecystotomy was performed.
From the original diagnosis in 1948 at Cp Chaffee Ark (peptic ulcer & pathological, non-functioning gall bladder.) I continued to perform duty even when in utmost pain, and until such time as surgery become absolutely necessary (May 18,1951). I believe that recurring-pain and discomfort later resulted in lessening my efficiency from a physical standpoint and has persisted to date.
Since the laparotomy (3 Mar 1955) I have been restricted to severe dieting.
The existence of pam, lumping and tightness was explained to a Dr in the USAH Cp Polk La in May 1954 prior to separation but nothing other than standard, separation physical exam was given plus X-Bays. It was explained to me that, if continuing pain existed after the removal of the gall bladder, that I would just have to suffer the discomfort and live with it. Due to this very attitude, I feel that further diagnosis should have been made, if not further medical observation and treatment. This may, under such circumstances, vilify the physical examination on separation, in .that other pain accompanied me after becoming employed in another field as a civilian, later, and within a year bringing upon me an acute attack of pancreatitis.
(c) In the application the plaintiff described his military status as a Lieutenant Colonel, Infantry, Army Beserve, in Items 2 and 5.
(d) The application includes the following statement:
I believe the record to be in error or imjust in the following particulars
That I was separated from active service at a time when my physical condition would have precluded “separation not due to physical disability,” * * * I explained my feeling in the matter before separation to a physician in Cp Polk Army Hosp; however, it was not deemed advisable to appear before a medical evaluation board.
(6) The application expressed the plaintiff’s desire to have witnesses appear, in person, on his behalf, at no expense to the Government.
*386 31. On March 19, 1956, the Army Correction Board requested the Surgeon General’s Office for comment and opinion as to whether the plaintiff’s physical condition at the time of relief from active duty was such as to warrant his retirement for physical disability, stating, among other things, that if available records were insufficient to effect a determination at this time, further comment and opinion be given as to the advisability of accomplishing physical evaluation for that purpose. The Correction Board, with this communication to the Surgeon General’s Office, enclosed the plaintiff’s 201 file, his medical records, and the compensation statement of the Veterans Administration.
32. On March 21, 1956, the Surgeon General stated, in reply, among other things:
2. * * * There can be no doubt as to the existence of gall bladder disease in this case.
$ ^ ¥
4. Subsequent to the operation [gall bladder removal in 1951] he continued to complain of discomfort in the upper right quadrant, bloating, heart bum, and nausea. These complaints were listed on his Standard Form 89 in May 1954 prior to his separation and the records do not indicate that he sought aid for relief of these symptoms at Army hospitals or dispensaries.
* * * * *
6. On viewing the entire records, it is believed that they do not substantiate the presence of ulcer or pan-creatitis at the time this officer was separated from the service.
7. The opinion is expressed that at the time this individual was separated from the service the records indicate that he did not have any disability which would have warranted his retirement because of physical disability under the laws, rules, regulations, or policies then in effect.
33. No hearing was held in response to the plaintiff’s request described in finding 30, and the requested correction of his record was not made.
34. On May 9, 1956, the plaintiff was ordered to active duty, for the period June 17 to July 1, 1956, at Fort Knox, Kentucky.
*387 35. When he reported for duty on June 17, 1956, he took exception to his physical condition due to the finding on January 25, 1956 (wherein he had been determined to be unfit for military duty, with a physical profile serial P411111), by making out a modified form DD-220,[3] in which he represented that he did not consider himself to be sound and well, and physically qualified for full military duty. He delivered the form to the Major, S-l, of the unit to which he was attached. He then performed this tour of duty, June 17 to July 1,1956. As a result of the exception, he underwent a final type physical examination, reported on Standard Forms 88 and 89, June 27 or 28,1956, and was given a physical profile P311111 for Reserve active duty. This record of physical examination was reviewed on June 29, 1957, by the Chief of Medical Service, who determined that the plaintiff could do duty with a P-3 profile.
The clinical evaluation at that time based on an electrocardiogram showed normal heart.
36. No limitations were placed on the plaintiff during the several remaining days of the 2-week Reserve training duty as a result of the physical examination of June 27,1956. As stated in finding 26, however, he had been informed in April 1955 that a waiver would not be granted in connection with his enlistment in the Army.
37. (a) On July 20, 1956, the plaintiff again requested the Army Correction Board to reconsider his application on the basis of new and additional evidence in the form of the Report of Medical Examination and the Report of Medical History, dated January 25,1956, given in connection with his attempt to enlist in the Regular Army, together with a Veterans Administration diagnosis of May 9,1955, and that agency’s 10 percent rating for residuals of gall bladder removal.
(b) The plaintiff’s covering letter states his contention as follows:
Reference is made to attached inclosures 1 through 4. On 25 January 1956, I appeared in Louisville at the Recruiting Main Station to enlist for CIC, pending a *388 very favorable grade determination the Chief Recruiting Officer believed could be obtained.
According to the medical examiners current physical standards precluded enlistment or further extended active duty although physical disqualification was predicated upon previous service-connected cholecystectomy. Results of the final type physical also prevented further action with regard to obtaining grade determination.
It is my sincere desire to return to active duty in order to complete 20 years or more for retirement due to approximately 13 years active duty.
Forwarding of this additional information was delayed pending completion of CG&S Instructor duty at Ft Knox from 17 June-1 July 1956, where, on consulting •with Chief, Medical Service, the same opinion was expressed with regard .to. .physical, standard ARs and the possibility of later being denied the privilege of. entering on active duty in officer or enlisted status.
Based upon this information and the actions taken by Recruiting Station examiners, I am .quite concerned relative to acceptance for further active duty and/or. enlistment the determination of which is herewith respectfully requested.
38. On July 24, 1956, 4 days after his request for reconsideration by the Correction Board described in finding 37, he completed an Army Reserve Qualification and Availability Questionnaire, sent to him by the Department of the Army as a member of a ready reserve unit. The plaintiff did not indicate therein that he was suffering from any physical defect that would preclude the performance of active military duty. On the contrary, he indicated his availability on 30 days’ notice, and set forth in some detail the duties of his present job of civilian Intelligence Officer.
39. On July 24,1956, the plaintiff also wrote the Adjutant General with respect to a resumption of active military service and enclosed a copy of his July 20, 1956, letter, to the Correction Board and the enclosures thereto. He requested a determination regarding his further acceptance for active duty or enlistment. It appears that the plaintiff’s position at that time was that it was inconsistent for the Army to reject him for enlistment by reason of chronic pancreatitis when the Veterans Administration had found pancreatitis to be 0 percent disabling.
*389 40. (a) On September 7, 1956, the Adjutant General replied to the plaintiff’s letter of July 24, 1956, stating that because his release to inactive duty in May 1954 had been by reason of category denial, he could not be recalled to active duty, but that he could apply to an Army Eecruiting Station for enlistment and grade determination, if eligible. The Adjutant General’s letter included specific instructions as to where to go to enlist, and how.
(b) Pursuant to that suggestion, the plaintiff, on October 8,1956, again submitted himself for physical examination for purposes of enlistment to the Examining Station at Louisville, Kentucky. However, he was found not qualified for enlistment, with a profile of 411111 by reason of chronic pancreatitis.
41. On December 17,1956, the plaintiff was notified by the Correction Board that his request for reconsideration had been denied after the additional evidence he had submitted on July 20, 1956, had been reviewed. This letter suggested that an appropriate waiver for enlistment be requested from the Adjutant General.
42. February 11, 1957, the plaintiff was ordered to active duty March 16-30, 1957, to attend .the National Besources Conference at. Akron, Ohio. When he reported for that duty, on March 16, 1957, he executed, in accordance with regulations, and without exception, a Physical Certificate on form DD-220, concerning his physical condition, which was identical (except that one refers to Camp Polk, the other to Ft, Polk) with the certificate he had executed on August 7, 1955.[4]
43. Pursuant to orders issued June 5, 1957, the plaintiff was ordered to active Beserve duty for a period of 30 days or less, to participate in an annual USAB training program between July 20 and August 5, 1957, at Fort George G. Meade. On July 21, 1957, he signed, without exception, a Physical Certificate, on form DD-220, similar to that quoted in finding 27, certifying to his physical qualification for active Beserve duty.
*390 44. While performing this tour of duty, the plaintiff sustained a myocardial infarction for which he was hospitalized in Army facilities until October 4,1957.
45. Also during this tour of duty, the plaintiff played two or three sets of tennis daily with other officers in very humid weather when it was exceedingly hot. In addition, he also ascended and descended 45 steps or more, five to eight times daily, in order to be on duty in a third-floor room. On the evening before his hospitalization, he complained to a fellow officer that he was exhausted.[5]
46. On September 28, 1957, while he was a patient at the Walter Reed Army Hospital, following the myocardial infarction, the plaintiff filed another application with the Army Board for Correction of Military Records alleging errors made within 3 years following his separation in 1954, namely, an attack of pancreatitis (1955) and a myocardial infarction (1957). He requested that in considering this application for separation May 31,1954, for physical disability that the Board consider and review simultaneously his Veterans Administration and Army records.
47. As evidence in support of the application filed September 28,1957, the plaintiff described his verbal request for a physical evaluation board before his relief from active duty May 31, 1954, and- the substitution of a final type physical examination and a local medical board, his hospitalization, approximately 9 months later, for pancreatitis, the symptoms of which he had explained to two medical officers before his .separation in 1954, the subsequent disallowance of three enlistment requests because of gall bladder removal in 1951, and chronic pancreatitis, and the denial by the Surgeon General’s Office of his request for waiver of these conditions.
He said the serious deterioration of his usually normal physical condition had commenced about August 8, 1948, at Camp Chaffee, Arkansas, with an acute attack, attended by symptoms which appeared to be possible indigestion and in- *391 eluded pain and lumping in the abdomen, or lower chest, extending to the lower right quadrant and the back, under the right shoulder, accompanied by nausea, and that this attack had been followed by recurrences in November 1950 and May 1951.
He mentioned left shoulder pains, while hospitalized in Okinawa, in 1950, accompanied “possibly” by other pains in the arm, and said that X-ray had disclosed calcifications in the bursa area at that time. He speculated that there was pain in the left arm at that time and it is possible that it might have been associated with the bursitis condition in lieu of being associated with a coronary condition, no electrocardiogram having been taken then.
He described the persistence of the abdominal symptoms of “lumping, tightness, and nausea in the abdomen, just under the bone structure of the chest center,” following the cholecystectomy, in 1951, and said he had explained these symptoms to two officers at Camp Polk a month or two before his separation from the service in 1954. He stated that: “By reference to these capable medical officers I do not wish to infer that either was the subject of malpractice or negligent in his devotion to the profession or patient.”
He said that, before his separation in 1954, he talked to the hospital commander and to the head of the medical service, seeking advice as to a physical evaluation board in view of his in-service cholecystectomy and pain following the operation but was advised that this procedure was not especially necessary since a thorough final type physical examination would be conducted.
He said that he had verbally indicated that he desired a physical evaluation board in view of recurrent pain but did not make a written request, that he had assumed that his prior medical records would be reviewed, and had indicated that he wanted to be assured that his physical condition was sound “because I didn’t want something coming along after I had gotten out of service.” He said that had he known that complete medical records were not available for screening by the local medical board, he would have submitted a formal, written request for a physical evaluation board.
*392 He then described the persistence of the symptoms mentioned above after be bad returned to civilian pursuits (remaining active meanwhile in Reserve work), and a diagnosis of acute pancreatitis with duodenal ulcer, in 1955, without any suspicion of coronary obstruction, no electrocardiogram having then been taken.
He said—
I became concerned and informed the Army Board of Correction of Military Records since the condition existed only nine months and two days following separation. I was admittedly angered at the time for I recalled that I had wanted to be assured of being in good physical condition prior to leaving the service, or be authorized to appear before a physical evaluation board.
He then described the continued persistence of the symptoms of lumping, pain, nausea, and stomach distress, through active duty training tours in August 1955, at Fort Meade, and while working at the Lexington Signal Depot, Lexington, Kentucky, despite continued dieting and efforts to take care of his physical wellbeing.
The application continues with the following statement:
In 1956 I remained active in the reserves as an instructor in Command & General Staff subjects and participated in active duty training from 17 Jun thru 1 Jul, Ft Knox, Ky. Having been denied enlistment in the Regular Army in Mar 1955 and Jan 1956 there was, I thought at that time, a necessity to indicate not being in sound physical condition on reporting to active duty. This procedure it was felt would lead to a physical evaluation board after explanation to the medical officer in charge. On reporting to the hospital Commander I was informed that this would not be applicable since service was only for a two-week tour. According to acceptable medical standards it was his verbal opinion that I was not physically qualified to perform military duty, as was the case when being determined as physically unfit to perform military duty by the medical officer at the Recruiting Main Station, Louisville, Ky, 1955 and 1956.
Continuing my reserve work in 1956-57, in Mar 1957 I served two-weeks active duty (15 days) at the National Resources Conference, Akron, Ohio, and later reported for active duty 20-21 Jul 1957, at Ft George G. Meade, Md for and [sic] additional 15 days. It was *393 while on this tour that pain, lumping, nausea and stomach distress, coupled with gradual and increasing severity of acheing [sic] of the arms occurred. This was on 2 August 1957, and on feeling very weak and having endured severe pain for about 4y2 hours, I reported to the hospital. I was in the admission office about 20 minutes, and almost asleep, when I was directed to see Capt Girard to whom I explained previous gall bladder and pancreatitis incidents. On cardiographic examination it was found that I had suffered an acute myocardial infarction.
In an effort to present my case in all fairness and honesty I do not believe that this was a sudden development. I sincerely believe that prior military medical history should show a distinct possibility that this condition was developing or existing during prior military service. I am vitally concerned, as explained to the board in 1955 or 1956, and as incidentally indicated to Capt Brown and Maj Gabrielson in the early months of 1954 prior to separation. I am also concerned respecting the legal and medical aspects involved in relation with stringent retirement laws and a varying range of pertinent, professional, medical interpretations.
48. On April 28, 1958, the plaintiff was notified that his request to the Correction Board for reconsideration of his application had been denied because the Board, again after considering the record of his most recent hospitalization (at Walter Reed Hospital, following the myocardial infarction), had found no basis for granting a formal hearing.

Findings Relating Primarily to the Plaintiff's Claim Based on the Myocardial Infarction m 1957

49. (a) Investigation of the facts and circumstances concerning the plaintiff’s hospitalization was not ordered immediately after the plaintiff’s myocardial infarction, when witnesses were available. It was directed by the Adjutant General on August 27,1957,25 days later, and an investigating officer was appointed on September 3, 1957.
(b) A Medical Board convened at Walter Reed on October 1,1957, found that the plaintiff had arteriosclerotic heart disease manifested by a myocardial infarction suffered during a training period of less than 30 days, and the plaintiff’s case has been dealt with since by the Army on the basis of that finding.
*394 50. (a) On October 4, 1957, the Assistant Registrar of Walter Reed Army Hospital certified that the plaintiff, Infantry — USAR, who then was a patient at the hospital, had been found by a Medical Board convened at the hospital on October 1, 1957, and approved by the commanding officer of the hospital on October 3, 1957, to have arteriosclerotic heart disease, “line of duty — No, EPTS.”
(b) The Board’s designation of the plaintiff’s condition, in its report, by the diagnostic number 4700, refers to the category of arteriosclerotic heart disease under a general category of diseases of the circulatory system in the Armed Services Basic Nomenclature, and not to any category of accidents or injuries.
(c) The Board’s determination that the condition found existed prior to service, as expressed in the letters EPTS, in the context of the report of the Board proceedings, refers to arteriosclerotic heart disease rather than to myocardial infarction, which the text of the report describes as a manifestation of the arteriosclerotic condition.
(d) The designation EPTS alone does not itself identify what period of the plaintiff’s service the condition found preceded. The clinical abstract that accompanied the report of the Board’s conclusions, however, indicates that the diagnosis relates to a culmination of a slowly developing arteriosclerosis, typical of human males, beginning at an early age, which, in the Board’s opinion, probably would not have been recognizable as clinical coronary disease before the episode of the myocardial infarction but that this is not certain in view of the plaintiff’s numerous diseases and complaints. The clinical abstract includes the following summary of the diagnosis:
* * * He was seen in consultation on 25 September 1957 by the Chief of the Cardiology Service who made the diagnosis of arteriosclerotic heart disease with trans-mural posterior myocardial infarction which occurred on 2 August 1957. It was his opinion that this officer has received the maximum benefits of hospitalization and is now ambulatory with a degree of activity which would permit him to return to his home. The consultant stated that on reviewing the patient’s history and clinical records the picture was one of an acute infarction occurring while on a period of active duty. The duties and *395 activities precipitating this infarction were not of an unusual or strenuous nature and could not in themselves be responsible for causing an acute coronary occlusion. There is nothing in the history or findings to indicate that this is not one of the ordinary instances of coronary-disease and this occlusion represents one of usual complications occurring in the course of coronary disease. At least at the present time there is nothing that would lead one to believe that the patient had clinical coronary disT ease prior to his present episode, but one cannot be positive in the face of his multiple systemic disease and complaints. At the present time there is no evidence of chronic hypertension, chronic valvular heart disease, diabetes or other associated disease that would aggravate the disability associated with a coronary disease. At present he does not have features of a recognizable coronary insufficiency, has no evidence of right or left heart failure and at his present return of activity he is doing well without complications.
# if: * * #
(e) The Board’s report does not specifically mention some of the numerous, prior complaints and illnesses disclosed by the plaintiff’s medical record. Omitted, among others, is any reference to the plaintiff’s complaint of chest pains in Okinawa, in 1951.
(f) The investigation of the plaintiff’s myocardial infarction was made in. accordance with requirements of paragraph 6b of Army Regulation Alt 600-140, which requires that if investigation of nonfatal disease is required, it will be conducted in the same maimer as prescribed for an injury.
51. The Office of the Surgeon General reviewed the report of the Medical Board’s proceedings at Walter Reed Army Hospital and recommended that the plaintiff be processed under AR40-212, paragraph 15b (1) and (3), as having suffered a myocardial infarction during a training period of less than 30 days.
52. (a) The plaintiff’s orders of June 5,1957, pursuant to which he reported for duty at Fort Meade for a period from July 20 through August 5, 1957, directed that, upon completion of that duty, he return to Lexington, Kentucky, t£NLT 5 Aug 57.”
(b) On September 6, 1957, while he was hospitalized at Fort Meade, following the myocardial infarction, he was
*396 ordered to remain on duty by attachment in the Medical Holding Detachment, Fort Meade, Maryland, effective August 6, 1957.
(c) Thereafter, on September 9, 1957, by Special Orders No. 112, he was relieved from attachment with the Medical Holding Detachment at Fort Meade, with reattachment to the Walter Reed Army Hospital for further observation and treatment, and on completion thereof, to return to proper organization and station.
(d) Medical Board Proceedings at Walter Reed, summarized above, resulted in a determination and report that the plaintiff contracted a disease on August 2, 1957, at Fort Meade, in line of duty not due to misconduct, a notification by memorandum to the officer in charge, Transfer Point Military Personnel Branch at Walter Reed, that he was unfit for duty, with a profile serial of P411111, and a diagnosis, “heart disease,” and a recommendation that he be separated under the provisions of paragraph 15b (1) and (3), AR 40-212.
(e) Section 15 of AR 40-212 includes the following provisions—
* * * * *
15. Members of the reserve components on active duty for training or participating in Reserve duty trai/ning cmd members of the Reserve Officers’ Training Corps on a training tour.
a. Medical board action. * * * When a member is considered medically unfit upon completion of hospitalization, his case will be evaluated by a medical board prior to release from the hospital. Members requiring hospitalization beyond the termination of their tour of duty or encampment will be evaluated by a medical board with a view toward disposition within the following time limits:
(1) LOT) NO Condition. At the earliest practicable date following the time that member becomes transportable.
‡ ‡ *

b. Processing following medical board action.

(1) Members physically unfit for further training as result of disease are not entitled to physical disability benefits under the Career Compensation *397 Act of 1949 and will not be processed under AR 635-40A unless the disease was incurred in line of duty while serving on active duty for training in excess of 30 days under authority of Sections 233(d) or 262(c) of the Armed Forces Reserve Act of 1952, as amended (Ms. Comp. Gen. B-130269 (1957)).
(2) Members physically unfit for further training as result of injwry incurred or aggravated during period of active duty for training or reserve duty training will be referred to the Physical Evaluation Board.
- (3) When it is determined that a member neither requires continued active hospitalization nor qualifies for processing as prescribed in (1) or (2) above, the member will be returned to his home.
* ^ * ❖ Hi
(f) The record discloses no formal orders directed to the plaintiff which, in terms specifically terminated his prior orders, or specifically relieved him from active duty as of October 4,1957.
53. On the day of the plaintiff’s release from Walter Reed Army Hospital on October 4, 1957, some records relating to his release then being made were changed three or more times. The exact nature and identity of such records were not positively established at the trial but there is a basis in the evidence for a reasonable inference that the records that were changed related to his receipt at that time of pay for all or a part of the period he was hospitalized at Walter Reed Army Hospital.
54. A Medical Board was convened in April 1958 for the limited purpose of determining whether the plaintiff’s disability was remedial within 1 year.
55. In 1961 the plaintiff and Ms attorney appeared before the Undersecretary of the Army, and an assistant, an officer. The plaintiff certified that he was advised by them that if he would write the Army Board for Correction of Military Records, requesting a hearing, he would be given a hearing as requested. Thereafter the plaintiff wrote a letter to the Board, requesting a personal appearance before the Board, with a copy to the Undersecretary, but the request was denied.

*398
Ultimate- Finding

56. (a) The evidence does not establish that the decision not to comply with the plaintiff’s verbal request for a physical evaluation board was arbitrary or capricious.
(b) The evidence as a whole does not establish that defendant’s denials of plaintiff’s several requests for correction of his medical evaluation as of May 31,1954, were arbitrary or capricious.
(c) The evidence is not adequately persuasive to sustain a finding that the defendant’s determination in 1957 that the myocardial infarction suffered by the plaintiff on August 2, 1957, was a manifestation of preexisting arteriosclerotic heart disease, rather than an injury, was arbitrary or capricious.
conclusion of law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is dismissed.

 The six numerals represent: general physical condition ; upper extremities; lower extremities; hearing; eyes, and neuropsychiatry. The ratings under each are from 1 to 4, 1 indicating no defect, 4 indicating nonacceptable defect, and 2 and 3 being between these extremes.

 under the system employed In establishing and recording an officer’s physical condition profile; he is rated for his general physical condition (P), upper extremities (U), lower extremities (L), hearing (H), eyes (E), and neuropsychiatry (S). The ratings under each of these symbols are from “1”' to “4.” The “1” indicates no defect; “4,” nonacceptable defects; “2” and “3” are between the two extremes.

Right upper quadrant.

 The formal text of this certificate is:
I now consider myself sound and well and physically qualified for full military duty. I was considered physically qualified for military service at the time of accomplishment of my last physical examination on or about 25 May 1954 at Camp Polk, Louisiana. To the best of my knowledge and belief, I have no physical defects or conditions, except as noted below, which would preclude the performance of full military duty.
A space is provided for noting any exception.

 See finding 27.

 The formal text of these certificates (see finding 27) is the same as the one to which he had taken exception on June 17, 19,53, as described in finding 35, by noting an exception in the space provided therefor.

 The myocardial infarction forms the basis for claims for disability from injury and for disability from disease incurred during a period of active duty in excess of 30 days that are additional to the claim based on the alleged failure to give proper consideration to his physical condition at the time of his release from active duty in May of 1954. Other facts pertinent primarily to the claims based on the myocardial infarction that are independent of any possible relation back of that misadventure to 1954 are stated in finding 49,