Collins, Judge,
delivered the opinion of the court:
Plaintiff, a former officer in the Air Force, with more than 12 years’ active service, sues to recover disability retirement pay from April 14, 1950, the day following his release from active duty for the convenience of the Government, and not by reason of physical disability. At the time he held the rank of lieutenant colonel.
*739 The questions presented for our decision are (1) whether plaintiff was permanently physically unfit to perform the required duties of his office at the time of his release and (2) whether the Department of the Air Force and its Board for the Correction of Military Eecords were arbitrary, capricious, and erroneous in law in denying plaintiff’s request for disability retirement.
Plaintiff enlisted as a flying cadet on February 25, 1938, at the age of 25. On February 1,1939, he was commissioned a second lieutenant, Air Corps, Army of the United States. He received successive promotions and, on April 8, 1944, attained the rank of lieutenant colonel. On June 3, 1947, presumably after passing satisfactorily a physical examination, plaintiff was appointed a colonel in the Air Force Reserve. In all posts he made an excellent record. Commissioner Arens found that plaintiff logged 2,800 hours of flight time, received official credit for 7 combat missions and 115 combat flying hours, all in the Pacific area during World War II. In addition, he won many citations, area ribbons with combat stars, commendations, and medals. He served his country well as a pilot, as a squadron commander, as a base operations officer, and in various other capacities, performing his duties up to the day of his release. Plaintiff continued flying until just before his separation.
In December 1944, plaintiff had an accident while warming up a B-25 plane. After a gust of wind hit the elevators of the plane, the control wheel was torn out of plaintiff’s hands and struck him in the stomach. (See finding 6(b), infra.) Despite being badly stunned, he and the co-pilot took off. Plaintiff asserted that soreness persisted for a week thereafter. Plaintiff did not report this to the base dispensary or to any of the medical' facilities or officers, lest he be grounded, lose his flying pay, and perhaps a chance of going overseas. His failure to report the matter left his medical record incomplete. In fact, no mention was made of it until late 1947, after he had received his commission as a colonel in the Air Force Reserve.
In July 1947, plaintiff was reassigned and restationed in Guam. In late 1947, plaintiff did see a Dr. Weinberg of the Medical Corps there, who prescribed barbiturates and sleep *740 ing pills, but who made no entries on plaintiff’s medical records. Plaintiff also described iris symptoms to Lt. Col. Furman L. Foster and Ft. Col. Walter F. Hein, doctors in the Medical Corps in Guam, who treated him for “nervous stomach.” The latter two doctors submitted statements “from memory” for the record. (See findings 9(d) and (e), infra.) Plaintiff did not remember any one of the three doctors then making any note of these visits in his medical records, and none were produced.
In October 1948 (after 16 months in Guam), plaintiff was ordered to Wright-Patterson Air Force Base in Dayton, Ohio. According to plaintiff, his stomach condition became more pronounced. However, plaintiff did not go to the dispensary hospital, nor did he see any of the service’s medics. Colonel Wood testified that his reasons were “I didn’t want to jeopardize my opportunity of getting a regular commission. After being in over 12 years I wanted my regular commission.” In the meantime, he “was taking Alka-Seltzers, getting barbiturates, and at this time * * * [he] would get some private doctors or use the drugstores.”
In February 1950, plaintiff learned of his selection for relief from active duty at a time no later than April 13. He strongly desired to remain on active duty, secure his regular commission as a colonel, and succeed an officer who was being transferred.
Plaintiff did not get his terminal physical examinations until early April 1950. At the time of the examinations, plaintiff requested that X-rays be taken and that he be given additional examinations, but the medical officer stated that there was no need for either. On April 6, 1950, plaintiff went to a Dr. Bartholomew, a private physician and specialist in Dayton, Ohio, who examined him. That doctor’s diagnosis and report included a finding of “urobilinogen: 4 plus.” Dr. Bartholomew advised plaintiff to go back to the service medical facility, seek a determination of the cause, and insist upon X-rays. Plaintiff forthwith returned and showed that report to the medical officer who had examined him. A further examination, including a series of gastrointestinal X-rays, was then made.
*741 Plaintiff was found qualified for separation, but his report showed the need for further medical consultation. On April 10th, he was examined by Col. Herbert W. Coone, Chief of the Medical Service of the Wright-Patterson Air Force Base Hospital. In the course of that examination, it was revealed that plaintiff had been having serious domestic problems, but that his symptoms were improving since a recent divorce. Also, plaintiff indicated that he had undergone an operation for sterilization on March 4, 1950. From his examination, Colonel Coone found a small hiatal hernia, which he believed to be congenital; he saw no need for hospitalization; and he found nothing that would render plaintiff unfit for military service. In testifying for the Government, Colonel Coone stated that plaintiff had been performing his duties well, “up to the time that he received word that his services were no longer required.” Colonel Coone advised plaintiff to take a bland diet and milk and to avoid excessive physical activity.
Plaintiff was relieved from active duty on April 13, 1950. He returned to Middleport, Ohio, and began operating a coal mine which he owned. Within a short time, he found this to be too much for him. In June 1950, plaintiff consulted a Dr. Davis, who advised him to pursue a different occupation. He remained under the care of Dr. Davis until about May 1,1951. On that date, plaintiff moved to Dayton, Ohio, where he took a civil service job as contract administrator at Wright-Patterson Air Force Base.
On May 2, 1951, plaintiff filed an application with the Veterans Administration Regional Office for compensation or pension. He again went to Dr. Bartholomew, who sent him to Dr. B. G. Must for X-rays. Dr. Must found a hiatus hernia and an apical duodenal ulcer. (There was a difference of opinion among the doctors as to whether there actually was an ulcer.) On April 24,1952, plaintiff was admitted to the hospital at the Veterans Administration Center, Dayton. During a full month’s confinement, he was given a comprehensive examination. The Regional Board of Veterans Appeals held that plaintiff’s hiatus hernia was a’ constitutional or developmental abnormality and not a disability under law; and that the gastric ulcer said to be within the *742 hiatal hernia was not incurred in or aggravated by service.
Plaintiff appealed the adverse decision of the Regional Board to the Board of Veterans Appeals in Washington, D.C. The latter board allowed plaintiff’s appeal, holding that the hiatus hernia with gastric ulcer was service-connected. On May 1, 1953, the Regional Office of the Veterans Administration advised plaintiff of its determination that he had been 60 percent disabled from April 14,1950, and that he was being awarded compensation of $72 per month from May 2, 1951, through June 30, 1952, and $82.80 per month from July 1, 1952. On July 3, 1961, plaintiff was given a physical examination for disability evaluation. The diagnosis at that time was hiatus hernia and pylorospasm. No peptic ulcer was found. Plaintiff’s disability rating was reduced from 60 percent to 30 percent, and his compensation reduced accordingly.
Approximately 3 months after the Board of Veterans Appeals acted on his appeal, plaintiff applied to- the Air Force Board for the Correction of Military Records. In his application, dated July 18, 1953, he asserted that he should have been retired for service-incurred physical disability which existed 'at the time of his separation. The Correction Board sought the advice of the Surgeon General. After a review of the Government’s record, the Surgeon General concluded that plaintiff “at the time of his release from"Active Duty, had no medical defect warranting consideration for disability retirement.” On July 15, 1954, the Correction Board denied plaintiff’s application on the ground that he had failed to submit sufficient evidence to establish probable error or injustice in his case.
On the basis of the entire record, we must conclude that the Air Force Board for the Correction of Military Records was not arbitrary, capricious, or erroneous in law. Nor was it improper for the Department of the Air Force to deny plaintiff’s request for evaluation by a Medical Review Board and for further hospitalization.
This case is strikingly similar to one recently before this court, Stephens v. United States, 174 Ct. Cl. 365, 358 F. 2d 951 (1966). Lt. Col. James D. Stephens, plaintiff in that action, requested to be referred to a physical evaluation *743 board at the time of his terminal examination. He had a full and complete medical record of many and varied types of illnesses, treatments, and operations while in the service. He was dismissed by reason of denial of category renewals, not by reason of physical disability. Colonel Stephens contended that had he been given a physical evaluation board and had he been competently and comprehensively examined prior to his release, such a board would have found him disqualified to perform military service at that time. He applied to the Veterans Administration and was found 10 percent disabled. He also made three applications to the Army’s Board for the Correction of Military Records and each time his application for disability retirement pay was denied. The Surgeon General reviewed his record and pointed out that there was no indication that Colonel Stephens sought aid or relief at any medical facility for the symptoms about which he complained, or that any condition warranted his retirement by reason of physical disability under pertinent statutes and regulations. Plaintiff Stephens’ contention that the Correction Board was arbitrary and capricious was not sustained, and his petition was dismissed.
The Stephens decision cites a long line of cases to show the established position of the Court of Claims in such cases. In this case, we follow that decision and those cited therein. Plaintiff has failed to produce cogent and clearly convincing evidence to warrant the substitution by this court of its judgment for that of either the doctors of the Air Force or the Correction Board concerning his unfitness for service at the time of his separation. See Stephens v. United States, supra, Furlong v. United States, 153 Ct. Cl. 557, 563 (1961) ; Boland v. United States, 169 Ct. Cl. 145 (1965).
In his brief, plaintiff Wood asserts that he was not fit for “full military duty,” but he has not established that the Correction Board was arbitrary, capricious, or erroneous in law. Absent convincing proof, we will not impute bad faith or arbitrariness to that board. Furlong v. United States, supra. Plaintiff contends that standards prescribed by Army Regulations, adopted by the Air Force (particularly AR 40-100 and AR 40-105), were not applied. We cannot agree that any applicable provisions were violated. This court *744 lias held that, in cases like this, the regulations specified above are not wholly apposite “in that they apply either to original appointment or retention rather than standards for physical disability retirement.” Towell v. United States, 150 Ct. Cl. 422, 436 (1960). We have been referred to no regulation which declared that the plaintiff’s ailments were disqualifying per se, nor does it appear that those infirmities were sufficiently permanent or severe to require retirement.
In support of his position, plaintiff cites and relies primarily upon this court’s decisions in the cases of Woodard v. United States, 167 Ct. Cl. 306 (1964), and Harper v. United States, 159 Ct. Cl. 135, 310 F. 2d 405 (1962). The facts and circumstances in those cases, and the proof submitted, warranted findings of arbitrary, capricious, and erroneous action by the Correction Boards, but the facts are clearly distinguishable from this case.
Finally, plaintiff urges that he should have been retired “with a 60% disability rating because the uncontroverted evidence shows that he was rated at 60% by the Veterans Administration * * This court has many times held that, in making their determinations as to whether an officer is entitled to disability retirement pay, the armed services boards are not bound by action taken by the Veterans Administration boards. Stephens v. United States, supra, 174 Ct. Cl. at 373 ; Furlong v. United States, supra, 153 Ct. Cl. at 563 ; Wales v. United States, 132 Ct. Cl. 765, 130 F. Supp. 900 (1955).
In view of our determinations stated above, the court concludes that plaintiff is not entitled to recover, and his petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Eichard Arens, and the briefs and argument of counsel, makes findings of fact as follows:
1. (a) Plaintiff, a citizen of the United States and a resident of the State of California, was born on October 9,1912.
(b) In this suit, plaintiff seeks to recover disability retirement pay from April 14, 1950, the day following his relief from active duty for the convenience of the Government *745 and not by reason of physical disability, while serving in the rank of Lieutenant Colonel, United States Air Force Eeserve.
2. (a) On February 15, 1938, plaintiff was given a thorough physical examination, including x-rays, by the Medical Corps of the United States Army for appointment as a Flying Cadet. No defect was found. The report of the physical examination, signed by two officers of the Medical Corps, contained the notation that plaintiff was estimated to be “Fairly good officer material” and that he was physically qualified for flying duty in “Heavier-than-air,” Classes 1,2, and 3.
(b) On February 25, 1938, he enlisted in the Begular Army Air Corps as a Flying Cadet and entered on active duty on the same date.
(c) On February 1, 1939, he was honorably discharged as a Flying Cadet and was on that date commissioned a Second Lieutenant, Air Corps, Army of the United States.
(d) On February 2, 1939, rated a pilot, he entered on active duty as a Second Lieutenant, Air Corps, Army of the United States.
3. (a) In May 1939, plaintiff was ordered to Wheeler Field, Hawaii, where as a pursuit fighter pilot he operated an aircraft known as a P-26, a light, single-engine, low-wing, monoplane.
(b) He performed tactical maneuvers in the P-26 including diving which wrought strain within his whole stomach area; but, plaintiff had none of the symptoms in 1939 while flying the P-26 which he experienced later in his service career.
(c) In December 1939, he was ordered to Hickam Field, Hawaii, where he operated a B-18 bomber-type, twin-engine aircraft which required considerably more physical exertion than did the P-26. While at Hickam Field, plaintiff also flew the four-engine B-17, the A-12 attack aircraft and the P-35 which was much faster than the P-26. He logged some 550 hours as a pilot at Hickam Field.
(d) On February 20,1941, he was promoted to First Lieutenant, Air Corps, Army of the United States.
*746 4. .(a) In July 1941, plaintiff was assigned to the Air Corps Gunnery School, Las Vegas, Nevada where he completed a course as an aerial gunner. During the following three years, while at the Gunnery School, he served as Squadron Commander, Base Operations Officer, Director of Flying, Group Commander and Director of Training.
(b) On February 1, 1942, he was promoted to Captain, Air Corps, Army of the United States.
(c) On August 11, 1942, he was promoted to Major, Air Corps, Army of the United States.
(d) In 1943, plaintiff was instructing a student pilot at the Gunnery School in the operation of a twin-engine B-26, a treacherous plane, known in the service as the “Flying Coffin.” There was a failure in one engine at low altitude and the plane landed about 30 degrees off the runway on rocky ground. The left tire blew out. Both plaintiff and the student pilot were “jarred.” Plaintiff reported the incident at the base dispensary and was examined by the Flight Surgeon. Plaintiff had none of the symptoms which he experienced later in his service career.
5. (a) In January 1944, plaintiff was ordered to the Clovis Air Force Base, New Mexico, where the first B-29 replacement training unit was located. He served first as Director of Flying and subsequently as Director of Training, in which capacities he checked out pilots in the operation of the four-engine B-29 which was the plane used in the bombing of Japan. He also became a qualified pilot in the P-12 and P-36 pursuit aircraft.
(b) On April 8, 1944, he was promoted to Lieutenant Colonel, Air Corps, Army of the United States.
6. (a) In June 1944, plaintiff was transferred to the 314th Bomber Wing located in Colorado Springs, Colorado where he served as Wing Area Inspector.
(b) In December 1944, while with the 314th Bomber Wing, plaintiff (then 32 years of age) was warming up a B-25 plane when a gust of wind, probably 50 miles an hour, hit the elevators (controls on the tail which maneuver the plane up and down). As a result, the control wheel, which is connected to the elevators by way of a shaft, was torn from plaintiff’s hands and struck him in the low chest and upper *747 abdominal area, just below the rib cage or breast bone. Plaintiff testified concerning the incident as follows:
A. I had the wind knocked out of me, saw spots swirling before my eyes, so I completely laid back and I don’t know how many minutes before I began to get my breath and was able to talk with the co-pilot while he had control of the wheel.
So, after getting some of the wind back, with my chest still hurting, why I taxied the aircraft out on the runway.
Q. Did you taxi it or did the co-pilot taxi it ?
A. I would say we both did; because of the gusts we both held onto the wheel.
Q. Then what?
A. We took the aircraft off and immediately getting into the air I turned the aircraft over to the co-pilot so that I could try to relax and get my wind back.
(c) Plaintiff suffered a soreness in the abdominal area which persisted several days. He did not report the occurrence to the base dispensary because he feared that he would be grounded and therefore lose flying pay and probably a chance of going overseas.
7. (a) In January 1945, plaintiff was ordered to Guam where he served as Air Inspector for the 314th Wing, composed of B-29s, the aircraft which in 1945 was used in bombing operations from Guam against Japan. He was technical advisor to the Commanding General, did administration and engineering work and had charge of certain flying procedures.
(b) The abdominal soreness which plaintiff suffered upon being struck by the control wheel persisted, particularly on combat missions in which he participated and which lasted from 13 to 15 hours. Plaintiff testified as follows:
A. After eating aboard the aircraft before we usually went in on a target, which you would get out of a copilot’s or a pilot’s seat and you would eat and then sit down to try to grab what we call our catnap, or if a bunk was available, and I would find if I would eat I would regurgitate, and at this point I would have to drink water to get the food to stay down, and I found that the best way was to try not to eat.
Q. By regurgitate would you explain what you mean ? What happened?
*748 A. I mean the amount of food that I would put into my stomach, when I would lie down the food would want to come back up into my throat, and I have grabbed a cup to spit out the bitterness that I had from my stomach.
Q. Had you had that type of reaction prior to these missions to Japan?
A. No, sir.
Q. Did you find that the position of your body had anything to do with the incidence of such attacks ?
A. I did. I found that by either standing up or sitting up erect that I did not have the feeling of the regurgitation.
8. (a) In October 1945, plaintiff was returned as a casual to the United States and sent to a rest camp at Greenport, North Carolina.
(b) At the rest camp he experienced a “fullness” after eating, although he could not eat a large meal and after eating he felt he wanted to regurgitate. He found that by sleeping with two pillows under his head he reduced the feeling of wanting to regurgitate.
He did not report his condition to a medical officer as he was then applying for a regular commission and felt that a finding that there was anything physically wrong with him would probably preclude him from getting the commission.
(c) Beginning in November or December 1945, he was assigned to various air bases in the United States.
(d) From the period beginning in June or July 1946, to June or July 1947, there was “more of a consistent feeling of tightness” in plaintiff’s stomach area and the “bitter regurgitation” was “more pronounced.”
9. (a) On June 3,1947, plaintiff was appointed a Colonel in the United States Air Force Reserve.
(b) In July 1947, he was reassigned to Guam where he was made Air Inspector for the Marianas Air Materiel Area and Operations Officer. He continued to fly aircraft.
(c) In the latter part of 1947, he visited a Dr. Weinberg of the Medical Corps in Guam. Plaintiff described his complaints as “tightness, tenseness; it seemed my stomach was tied up, that if I ate very much food I would want to regurgitate.” Dr. Weinberg prescribed barbiturates and sleeping pills, but made no entries on plaintiff’s medical records.
*749 (d) He was also treated by Hr. Furman L. Foster, Lieutenant Colonel, Medical Corps in Guam, to whom plaintiff described the same symptoms which he had previously described to Dr. Weinberg. Dr. Foster subsequently furnished plaintiff a signed statement, the body of which reads:
I certify that I vaguely remember treating Lt. Col. Curtis E. Wood while stationed on Guam in 1948. There is no way for me to possibly recall the number and dates of treatment other than it was the first half of 1948.
Clinical and laboratory findings are not remembered. Treatment is not remembered.
As the medical records were so poorly kept on Guam and the medical facilities for adequate diagnosis were not available, I do not believe it would be fair to judge Mr. Wood’s case due to lack of records or due to my lack of memory of definite facts. It would be my opinion that proper diagnostic studies were not done at that time, and Mr. Wood was probably treated for a “nervous stomach” as so many had the same symptoms. It is also my opinion that his symptoms were probably caused by what was later diagnosed as esophageal hiatus hernia. I am sorry I cannot remember his case more accurately.
(e) He was also treated by Dr. Walter F. Hein, Lieutenant Colonel, Medical Corps in Guam, who subsequently furnished plaintiff a signed statement, the body of which reads in pertinent part:
I believe, as I remember, that I perscribed [sic] and issue [sic] some two to four ounces of Elixir of Phenobarbital to the above named patient, while on duty as Flight Surgeon for the 374th Troop Carrier Wing, Harmon Field, Guam, M.I., during the middle of the year 1948. This preparation was to be used in the treatment of a nervous stomach, he stated he had at that time and was concurred in in my diagnosis. The per-scription [sic] was issued and dispensed to him for use with instructions for his return for observation. I do not remember of his return.
This certificate is furnished as correct and accurate to the best of my knoweledge [sic] and belief, entirely from my memory, with further proof lacking.
10. (a) In October 1948, plaintiff was ordered to Wright-Patterson Air Force Base, Dayton, Ohio, where he did some flying and remained until he was relieved from active duty on April 13,1950.
*750 (b) During his duty at Wright-Patterson Air Force Base, his symptoms of “fullness,” pain in the stomach and regurgitation became more pronounced.
(c) Pie did not go to the dispensary hospital with his complaints because he did not want to jeopardize the opportunity of getting a regular commission. Instead, he visited private doctors and took Alka-Seltzer and barbiturates.
ill. (a) In February 1950, plaintiff was notified that he had been selected for relief from active duty at a time no later than April 13,1950. He had wished to remain on active duty and to obtain a regular commission in the Air Force, but was advised in the latter part of March that the decision to relieve him from active duty was irreversible.
(b) In the early part of April 1950, Air Force medical officers gave plaintiff terminal physical examinations. Plaintiff testified that at the time of the examinations he requested that x-rays be taken and that he be given additional physical examinations, but that the medical officer replied that there was no need for either. Whereupon plaintiff visited a Dr. Bartholomew, a doctor of internal medicine in Dayton, Ohio who gave plaintiff a physical examination, including a fluoroscopic examination. Dr. Bartholomew’s report included the following: “Had x-rays: — last one about A-5 yrs. ago.” The diagnosis included: “urobilinogen: 4 plus.” He recommended that the cause of the urobilinogen be determined and that x-rays be taken. Thereafter, plaintiff took Dr. Bartholomew’s report, dated April 6,1950, to the medical officer, who, after reading the report, caused a series of gastrointestinal x-rays to be taken of plaintiff.
(c) Plaintiff’s terminal physical examination records reflect that he was found qualified for separation, but that further medical consultation was indicated. Accordingly, plaintiff was examined by Colonel Herbert W. Coone, the Chief of the Medical Service of the Wright-Patterson Air Force Base Hospital, whose report, dated April 10, 1950, reads as follows:
History: This 37-year-old Lt. Colonel is referred for evaluation prior to separation, because of urobilino-genuria, reported by a private physician. The latter also recommended a G.I. x-ray.
*751 Family history: Father 60 — has diabetes; mother— 60 has high blood pressure. One sister and one brother living and well; one brother killed in action.
Past history: Appendectomy 1922; tonsillectomy and adenoidectomy 1926; fracture of rib and scapula due to football 1930. Nasal operation (spur?) in 1942. Sterilization 4 March 1950.
Present illness: Patient consulted private physician for the purpose of insuring the detection of any physical abnormalities prior to separation. Private physician reported normal urinalysis, including 1.029 specific gravity, complete blood count, a fasting blood sugar (92), Kahn, and corrected sedimentation rate. A “4+” urobilinogenuria was noted, and private physican recommended investigation of this finding, and also, a G.I. Series.
Systemic review reveals that he has had serious domestic problems, eventuating in a recent divorce. For the last four years, usually at night, he has noted an upper abdominal fullness and occasional bitter eructation. He suffered considerably from “nerves” and insomnia since January 1947; these symptoms improving since divorce. History otherwise negative. He has been in the habit of smoking two packs of cigarettes daily, but denies any chronic use of alcohol.
Physical examination: Physical examination reveals a medium-built, active male of 37 years, in no acute discomfort. Blood pressure 104/66. Physical findings negative with the exception of residual obstruction in the left nares, due to deviation of the septum, and gin-gival retraction of minimal degree.
Laboratory data: Three urobilinogens were performed and found negative. Urinalysis negative. Van den Bergh — no direct reaction, indirect normal. Urea Nitrogen 13. Fasting blood sugar 101. Thymol turbidity 4 units. Cholesterol 326. G.I. Series showed a small hiatus hernia.
Impression: One hiatus hernia, small.
Recommendation: Clearance for separation. In our opinion, no definitive therapy is indicated for the small hiatus hernia other than the use of a bland diet and milk. Patient advised to avoid excessive physical activity, increasing intra-abdominal pressure. We can see no explanation of the reported urobilinogenuria, and see no present significance in the elevated cholesterol.
*752 (d) Plaintiff testified that after the x-rays were taken lie was advised by Colonel Coone that he had a small hiatal hernia which is a profusion of the stomach above the diaphragm. Plaintiff asked Colonel Coone, “What do you do about this?” Colonel Coone, according to plaintiff, replied, “There isn’t much you can do, but the advice I could give you is to stay on a bland diet, don’t exert yourself, no heavy exercise of any kind or heavy work, and to see your own physician.” Plaintiff stated that he asked for hospitalization, but that Colonel Coone said that the Air Force considered plaintiff’s condition of hiatal hernia to be congenital and therefore no hospitalization was required. Plaintiff testified that he then requested that he be permitted to go before a medical board to determine whether he should receive a medical discharge, but that Colonel Coone declined his request and stated that there were no findings in the case to support going before a board.
(e) On April 18, 1950, as hereinbefore indicated, plaintiff was relieved from active duty for the convenience of the Government and not by reason of physical disability, while serving in the rank of Lieutenant Colonel.
(f) At the time of his release, he had active duty service of more than 12 years’ duration. As a pilot he had logged approximately 2,800 hours of flight time. He had received official credit for 7 combat missions and 115 combat flying hours. In addition to a number of area ribbons with bars and combat stars, he had received a service commendation for “Director of Training at Clovis, New Mexico.” He had been awarded the Bronze Star as Wing Air Inspector for achievements in organizing and setting up procedures for the maintenance of aircraft and administrative procedures for the handling of approximately 20,000 men composing the Wing. He had been awarded the Air Medal by reason of accreditation for 5 or more flying combat missions.
12. (a) Within a month or two after his relief from active duty, plaintiff began operating a coal mine which he owned in Middleport, Ohio. He testified that, although prior to entering the service he had been a shovel operator in general construction work and had operated other heavy road machinery, he found the exertion of operating the *753 coal mine “would be to a particular point that my stomach just felt like it was going to shoot out of my mouth,” and that the “bitter bile and regurgitation was much more prevalent then than I ever had before.”
(b) In June 1950, he visited a Dr. Davis, his private doctor in Middleport, Ohio, to whom he explained that he had a hiatal hernia. He told Dr. Davis of his regurgitation after lifting and of the tight pain which 'he experienced in his stomach upon doing physical labor. Dr. Davis prescribed a bland diet and recommended that plaintiff pursue another occupation involving less physical exertion. Dr. Davis also recommended that plaintiff seek admission to the Veterans Administration Hospital in Cincinnati, Ohio.
(c) For about 6 weeks in the summer of 1950, he was a student at the University of Ohio, Athens, Ohio, during which time he continued with the bland diet and remained under the care and treatment of Dr. Davis who gave him tranquilizers, sedatives, and barbiturates. His symptoms of fullness and regurgitation persisted. In order to sleep he had to have two pillows, to pull his knees up to his stomach, and to maintain a doubled-up position. Beginning in early June 1950, and until May 1951, plaintiff’s coal mine was operated by plaintiff’s father, but plaintiff kept the books on the mine.
13. (a) Effective February 28, 1951, plaintiff was discharged from his commission as a Colonel, United States Air Force Deserve. On this date all temporary appointments held by him were terminated under the authority of Section 515d, Public Law 881, 80th Congress, August 7, 1947, and AFL 36-26, dated November 29,1949.
(b) He remained under the care of Dr. Davis until about May 1,1951, when he moved to Dayton, Ohio where on May 2, 1951, he began working in a civil service job as contract administrator at Wright-Patterson Air Force Base. The work was not physically strenuous. He has since been continuously employed by the Air Force in office work as a civilian employee of the Government. At the time of the trial, he was employed as a procurement analyst at Mira Loma Air Force Station in California.
*754 (c) On May 2, 1951, the Veterans Administration Regional Office at Cincimiati, Ohio received plaintiff’s application for compensation or pension. In response to item 32 in which was to be set forth the nature of the disease or injury on account of which claim is made and the date each began, plaintiff wrote “Hernia.” Item 33 read: “If you received any treatment while in the service, give name, number, or location of hospital, first-aid station, dressing station or infirmary, or the organization to which it was attached, the dates of treatment, and nature of sickness, disease, or injury.” Plaintiff responded: “Operation on nose — Hernia noted on exam report at discharge.” Plaintiff made no response to items 34, 35, 36, and 37 which called for the names and addresses of all civilian physicians who had treated him for any sickness, disease, or injury, prior to, during, or since his service.
(d) In Dayton, plaintiff again went under the care of Dr. R. K. Bartholomew who had previously examined him in April 1950, prior to his relief from active duty. Dr. Bartholomew again examined plaintiff on April 15,1952, and reported that his symptoms were relative to the gastrointestinal tract; that among other studies an upper gastrointestinal series was done, and that the x-rays again demonstrated the hiatal hernia and also an apical duodenal ulcer. Dr. Bartholomew sent plaintiff to Dr. B. Gr. Must for x-rays to be taken.
(e) On April 16, 1952, Dr. Must reported on plaintiff as follows:
Upper G.I.:
There is normal swallowing and a normal esophagus. There is an easily demonstrated hiatus hernia which is largely reduced in the erect position. In the supine position with the hernia filled, there is regurgitation into the esophagus. There is no obstruction. The stomach fills satisfactorily without evidence of an intrinsic lesion. Moderate resistance is encountered on attempting to fill the duodenal bulb. The bulb itself when filled shows no persistent deformity, however there is a persistent barium fleck at the apex of the bulb and the patient is extremely tender at this one point. There is no obstruction. The duodenal loop is within normal *755 limits as to size and contour and the barium passes into the proximal small intestine.
Impression:
1. Hiatus hernia.
2. Apical duodenal ulcer.
14. (a) On April 24, 1952, plaintiff was admitted to the hospital at the Veterans Administration Center, Dayton, Ohio, where he remained until he was discharged on May 23, 1952.
(b) The clinical record of plaintiff’s hospitalization reads in pertinent part:
History of present illness:
This 39 yr. old white veteran of WWII was admitted with a history of chronic epigastric discomfort. He noted the onset of his symptoms in 1948 when he described a vague epigastric aching or feeling of “tightness.” The symptom was common when under emotional stress and was relieved by food at that time. His symptoms became more prominent for 2-3 day periods, approximately once monthly. At that time the patient was also troubled by insomnia and used sleeping tablets for an eight month period. Patient’s symptoms became worse shortly prior to his discharge in 1950 when he also noted that lying down increased the “tenseness” in his epigastrium and bending over in a flexed position on his side would often relieve it. At times, standing in the erect position would relieve the pain. X-ray studies revealed the presence of a hiatal hernia, but no specific treatment was advised. One year prior to admission, the patient’s symptoms again became prominent and he visited a physician who told him to refrain from heavy lifting to eliminate irritating agents from his diet and to look for blood in his stool. Shortly after that time the patient obtained a job as a contracting officer at Wright-Patterson Field which entails considerable responsibility and states that since this time his symptoms have become more prominent when under a great deal of stress at work. His abdominal complaints are those noted at the onset of his illness, but in addition he has a generalized warm sensation over the lower anterior abdominal wall accompaning [sic] his epigastric discomfort. A GI series was performed by private physician 2 wks. prior to admission and the patient was told that he had a large ulcer of the lesser curvature of his stomach.
*756 Past bistory:
Essentially negative except for surgical repair of deviated nasal septum in 1943 and sterilization procedure in 1949 [sic].
Physical examination:
Weight 150 pounds, temperature 98.6, and blood pressure 108/88. Patient appeared w/d and w/n and was in no apparent distress. The pertinent physical findings included a wide oblique appendectomy scar, carious teeth, a small firm left axillary node, and bilateral pes planus. There was no evidence of abdominal mass, tenderness or rectal shelf.
Laboratory data:
Admission hemogram revealed hemoglobin 13 gms., KBC 4.7 million, WBC 12,400 with neutrophils 74, lymphs 23, mono. 2, and eosinophils 1. Sed rate was 10 mm per hr. Urinalysis was within normal limits. Gastric analysis revealed slight hyperacidity with the free acid rising to 88° on the second specimen at which time the total acidity was 104°. Serology was negative. Initial examination of stool for occult blood revealed a 4+ on 4-29-52. Reticulocyte count on 5-5-52 was 0.7% Repeat stool examinations were as follows: Trace, negative, 1+, trace, 2+, and 1+ in successive determinations. Patient’s most recent hemogram on 5-13-52 showed no decrease in hemoglobin or RBC. GI series performed shortly after admission showed no evidence of gastric ulcer or duodenal lesion. A hiatal hernia was visualized and there was a suspicion of an ulceration within the hiatal hernia. A repeat GI series performed on 5-5-52 again revealed the presence of a hiatal hernia with a lesion suggesting an ulcer crater and another filling defect, which resembled a small polyp within the herniated stomach. Review of the films performed by the patient’s private physician before admission, similarly revealed a hiatal hernia but no evidence of stomach or duodenal lesion was noted by our Roentgenologist. The interpretation by the patient’s private physician was not received.
Hospital course and treatment:
There has been little change in the patient’s symptom-atology since admission with periods of transient relief having been noted followed by minor exacerbations of epigastric tightness and paresthesia of the lower anterior *757 abdominal wall. The nature of the patient’s symptom-atology suggested a functional origin or at least a marked functional origin or at least a marked functional overlay of his symptoms. Patient was put on a bland diet, given in between meal and bedtime milk and cream together with calcium carbonate, and phenobarbital and belladonna tablets 4 times daily. There was no definite response elicited by these medications. At a later date the calcium carbonate was discontinued and the patient was given y2 oz. of gelusil 4 times daily. Esophagoscopy was performed after the x-ray suggesting the presence of a polyp and ulceration within the hiatal hernia was obtained, but no lesion could be visualized. Since the patient was not in tren-delenburg and performing valsalva during this procedure, it is conceivable that the otherwise herniated portion of the stomach would not be accessible to the lense of the esophagoscope. Patient was presented to Gastro-enterology Conference on 5-15-52 and the unanimous opinion was expressed that the patient was not a candidate for surgery. Dr. Goodman believed that the lesion visualized in the roentgenologic examination may have been prolapsed esophageal mucosa which he has seen on approximately 8 or 4 occasions. He did admit the possibility of ulcer in the esophageal hiatus hernia, however. Dr. Miller and Dr. Zinniger believed that the lesion was an ulcer and Dr. Burton had a similar view. Medical treatment was urged by these consultants who felt that the patient’s symptoms were unrelated to the pathology found. It was also suggested that the patient have a follow-up GI series in 3-4 wks. BA enema was performed on 5-19-52 and although the written report has not been received as yet, it appeared negative to this examiner.
Discharge MHB 5-23-52.
Diagnoses:
1. Esophageal hiatus hernia: Treated Unchanged.
2. Gastric ulcer within hiatal hernia: Treated Unchanged.
Becommendations:
1. Discharge MI-IB 5-23-52.
2. Bland diet. Gelusil ½ oz. after meals and at h.s. Phenobarbital and belladonna tablets 1 q.i.d.
3. Private physician care and follow-up GI series in 3-4 wks.
*758 15. (a) On December 11, 1952, plaintiff appeared and testified before a Regional Board of Veterans Appeals at Cincinnati, Ohio. The Regional Office had held that plaintiff’s hiatus hernia was a constitutional or developmental abnormality and not a disability under law; and that the gastric ulcer said to be within the hiatal hernia was not incurred in or aggravated by service.
(b) Under date of April 9, 1953, a Board of Veterans Appeals, Veterans Administration, Washington, D.C., rendered its decision on plaintiff’s appeal, the body of which reads:
Question at issue:
Service connection for esophageal hiatus hernia with gastric ulcer within the hernia.
Outline of material evidence:
Active service extended from February 2, 1939 to April 13, 1950. No pertinent complaints or defects were disclosed on examination prior to service. Service medical records received do not show treatment pertinent to the issue. At the time of separation it was reported that he had consulted a private physician who stated he found a condition unrelated to the issue on appeal and recommended investigation of this finding and also a gastrointestinal series. Systemic review revealed that for the preceding four years, especially at night, the veteran had noted an upper abdominal fullness and occasional bitter eructation. Gastrointestinal series revealed a small hiatus hernia. No definitive therapy was recommended for this condition other than use of a bland diet and milk and the advice to avoid excessive physical activity.
R. K. Bartholomew, M.D., stated that he examined the veteran initially on April 5, 1950 as the result of which it was ascertained that he had a hiatal hernia, that he was again examined on April 15, 1952 when symptoms were referable to the gastrointestinal tract and among other studies an upper gastrointestinal series was done which again demonstrated the hiatal hernia and also an apical duodenal ulcer.
The veteran was hospitalized by the Administration on April 24, 1952 with a history of chronic epigastric discomfort since 1948, described as a vague epigastric aching or feeling of “tightness.” The symptom was stated to have come when under emotional stress and was relieved by food at that time. The symptoms be *759 came more prominent periodically and 'he was also troubled 'by insomnia for a time. Symptoms became worse shortly before separation in 1950 when he also noted that lying down increased the “tenseness” in his epigastrium and bending over in a flexed position on his side would often relieve it. At times standing in the erect position would relieve pain. A gastrointestinal series had been performed by a private physician two weeks prior to admission and he was told that he had a large ulcer of the lesser curvature of the stomach. Gastrointestinal series shortly after admission revealed a hiatal hernia and a suspicion of ulceration within the hernia. Repeat gastrointestinal series again revealed the presence of a hiatal hernia with a lesion suggesting an ulcer crater and another filling defect which resembled a small polyp within the herniated stomach. Review of the films performed by the private physician before admission, similarly revealed a hiatal hernia but no evidence of stomach or duodenal lesion was noted. It was reported that there was little change in the symptomatology since admission with periods of transient relief having been noted followed by minor excerba-tions of epigastric tightness and paraesthesia of the lower anterior abdominal wall. The veteran was presented to gastroenterology conference following which the diagnoses were esophageal hiatus hernia and gastric ulcer within the hiatal hernia. He was discharged from the hospital on May 23,1952 with instructions to follow diet and prescribed medication, receive care from his private physician and to return for follow-up gastrointestinal series.
Discussion and decision:
The examination before entrance upon active duty disclosed no pertinent complaints or defects. At the examination prior to separation from service in April 1950 a four year history of characteristic hiatus hernia symptoms was recorded and the presence of this condition was confirmed by x-ray examination at that time. A period of hospital study by the Administration in 1952 further confirmed this diagnosis and in addition disclosed a gastric ulcer within the hernia. In view of the nature and circumstances of the veteran’s service and the resolution of a reasonable doubt in his favor, it is the determination of the Board that service connection for hiatus hernia, found at separation, is warranted on the basis of service in the Regular Establishment, and that gastric ulcer subsequently reported is in etiology *760 related to the bernia. The Board finds therefore that Regular Establishment service connection is warranted for esophageal hiatus hernia with gastric ulcer within the hernia. The appeal is allowed.
(c) A letter dated May 1,1953, to plaintiff from the Cincinnati, Ohio Regional Office of the Veterans Administration reads in part:
Your claim for disability compensation based upon your service other than in time of war has been reconsidered on the basis of all evidence of record.
It is shown that your service comiected condition of gastric ulcer with esophageal hiatus hernia is service comiected and 60% disabling from April 14, 1950. No other change is shown in the status of your claim. Accordingly, an award has been approved whereby you will receive compensation payments in the sum of $72.00 monthly from May 2, 1951 through June 30, 1952; and, $82.80 monthly from July 1,1952.
* * * * *
The enclosed VA Form FL 8-57 is forwarded for your information regarding your right to outpatient treatment and hospitalization for your service connected condition.
Since the benefits for which you have appealed have been granted, your appeal has been withdrawn.
16. (a) In an application dated July 18, 1953, to the Air Force Board for the Correction of Military Records, plaintiff stated: “I believe an error was committed in not retiring me for my sendee-incurred physical disability at the time of my separation from active duty on 13 April 1950.” He advised the Board that he did not desire to appear before the Board; that he did not desire to have witnesses appear in person in support of his application; and that he would be represented by counsel.
(b) By memorandum dated November 20,1953, the Office of the Surgeon General advised the Air Adjutant General respecting plaintiff as follows :
1. Applicant requests that his release from Active Duty of 13 April 1950 be changed to disability retirement. He bases his claim upon a history of vague epi-gastric aching or feeling of tightness starting in 1948. This symptom further started to come on under emo *761 tional stress with increased prominence periodically. As further basis for his claim he points out the existence of a hiatal hernia, known to be present prior to his discharge, and finally, 2 years later in 1952, the development of an ulcer within the hernia.
2. Eeview of military medical records reveals that on 10 April 1950 Wood was examined by the Chief of the Medical Service at Wright-Patterson Air Force Base. History recorded at that time included a sensation of upper abdominal fullness and occasional bitter eructation. Also complained of nerves and insomnia with symptoms improving since the resolution of an unsatisfactory domestic situation by a recent divorce. There were no abnormal physical findings referrable to the gastrointestinal system. G.I. series showed only a small hiatus hernia. Patient was advised of necessary dietary measures to minimize symptoms of his congenital defect.
3. On 24 April 1952, upon hospitalization by the Veterans Administration, Wood again gave history of vague abdominal discomfort since approximately 1948 but then alleged that Ms symptoms became worse shortly prior to his separation. According to recorded history, he then had no symptoms of a degree of severity to cause him to seek a physician’s aid until approximately one year prior to hospitalization by the Veterans Administration. It is further recorded that his symptoms did not then again become prominent until he accepted a new job entailing considerable responsibility and there is noted a relationship between symptoms and job stress. It was at tMs time that X-Bay examinations demonstrated an ulcer within the hiatus hernia.
4. The symptoms of which Wood complained during the four year period prior to his separation are compatible with the congenital defect, hiatus hernia, found on G.I. series prior to his separation. It is well to note that at no time were these of such severity as to cause Wood to seek medical attention until his involuntary release from Active Duty became imminent. The existence of this defect is not in itself disqualifying as evidenced by the many years of military service including flying duty performed by Wood during which stated defect was undoubtedly present. Although symptoms of hiatus hernia may be similar to those of peptic ulcer, the existence of an ulcer in 1950 when symptoms were very mild cannot rightly be assumed from the existence of an ulcer two years later at which time it is shown that Wood was under severe emotional stress in relation *762 to his job responsibilities. The relationship between emotional stress and the development of peptic ulcers is a generally accepted medical fact.
5. It is the opinion of the Surgeon General, USAF, that Wood, at the time of his release from Active Duty, had no medical defect warranting consideration for disability retirement.
6. Recommend that no change be made in Wood’s military records on medical grounds.
A copy of the foregoing memorandum was furnished to plaintiff who, under date of May 17, 1954, filed a rebuttal thereto with the Air Force Board for the Correction of Military Records.
(c) The body of a letter, dated July 15, 1954, addressed to plaintiff from the Air Force Board for the Correction of Military Records reads:
Reference is made to your request for correction of your military record, under the provisions of Section 207 of the Legislative Reorganization Act of 1946, as amended by Public Law 220,82nd Congress.
The Administrative regulations and procedures established by the Secretary of the Air Force for the guidance of the Board provide that an application may be denied where the applicant has not submitted sufficient evidence to establish a showing of probable error or injustice in his case.
I regret to advise you that a careful consideration by the Board of your military record, together with such facts as have been presented by you, fails to establish a showing of probable error or injustice in your case. Therefore, in the absence of additional material evidence tending to show the commission of an error or injustice, no mrther action on your application is contemplated.
A copy of this letter has been sent to your counsel, The Disabled American Veterans.
17. (a) On July 3, 1961, plaintiff was given a physical examination by the Veterans Administration for disability evaluation. His complaint, as appears in the report, was: “I still have the tight or knotted feeling in my stomach. I have to take tranquilizers, when I am lying down, it feels better if I pull my knees up. I have nervousness when under pressure.” Under the item in the report entitled “Pertinent Clinical History, Operations, Physical Findings, *763 and Provisional Diagnosis” appears the following: “Hiatus hernia with gastric ulcer within the hernia, no surgery.”
(b) Other pertinent parts of the report on the foregoing physical examination read:
Radiographic report
Upper GI series:
The esophagus including multiple spot views of the lower end of the esophagus reveals a characteristic small sliding type of hiatus hernia measuring approximately 3 x 1 y2 cms. in size. Normal visualization of delicate mucosal pattern in the herniated portion of the stomach and adjoining esophagus with no evidence of inflammatory changes or ulcer crater formation at this time or other organic sequelae. The stomach and duodenal bulb are otherwise normally outlined. At three hours the column is in the small gut with small gastric residue indicating some pylorospasm.
Routine chest:
Negative.
Conclusion:
Routine Chest: Negative. Upper GI series: Small sliding hiatus hernia with normal mucosal patterns and no X-ray evidence of inflammatory or ulcerative changes at this time in the region of the hernia; otherwise, negative study of stomach and duodenum. Three hour gastric residue indicates pylorospasm.
46. Diagnosis
1. Hiatus hernia
2. Pylorospasm
3. Peptic ulcer not found at this exam.
18. Under date of September 3, 1961, plaintiff was given a Veterans Administration rating decision which reads in part:
CODING ONLY KEY TO RATING HEADINGS J — JURISDICTION : i — issue: f — facts: d — discussion
DIAG.
CODE %
* * * * *
I. Evaluation service connected disability.
F. Veteran is steadily employed at $800.00 per month, but claims seven days loss last year. *764 GrI series shows small hiatus hernia with no inflammatory or ulcerative changes. Gastric residue indicates pylorospasm. Veteran formerly took antiacids and antispasmodics, but not at present. No evidence of secondary anemia or jaundice. No epigastric tenderness or spasticity, at present. No masses or muscular rigidity. Pulse are not found. Veteran resorts to soft strain foods frequently and an evening snack, but not repeated feedings and is not restricted to liquids.
Eating of 4-27-53 amended as follows:
1. so iNO. pte., 38 USC 331
60 from 5-2-51
17205-30 from 11-3-61
HIATUS HERNIA WITH PYLOROSPASM
* * * * *
19. At the time of the trial plaintiff was still experiencing tenderness below his chest bone and regurgitation on reclining after eating. He was on a diet which precluded greasy, fried foods and he was still taking various medicines for gastric discomfort. He has continued to avoid strenuous physical exertion.
20. (a) At the trial plaintiff produced the expert testimony of Dr. Maurice Mensh, a practicing physician and assistant clinical professor of medicine at the George Washington University Medical School. He is a Board certified internist in gastroenterology, belongs to the American College of Physicians, and is in the consulting services of the General Hospital of the District of Columbia. For approximately three years he was associated professionally with Dr. Henry L. Bockus, then chairman of the Department of Gastroenter-ology of the Graduate School of the University of Pennsylvania. Dr. Bockus, President of the World Congress of Gastroenterology, is a past President of the American Gas-troenterology Society and is author of a standard, three-volume book, “Gastroenterology,” on which Dr. Mensh collaborated. Dr. Mensh has also written a number of articles which have appeared in medical j oumals on gastroenterology.
(b) Dr. Mensh testified that he had examined plaintiff’s *765 medical records and that he had seen plaintiff for the first time on the day prior to his appearance as a witness in the case, at which time he elicited plaintiff’s history and made a palpation examination of plaintiff. Dr. Mensh expressed the opinion that on the date when plaintiff was relieved from active duty, April 13, 1950, he 'had a symptomatic hiatal hernia which was caused 'by “the direct blow which plaintiff sustained in the performance of his duty flying a plane”; that a hiatus (or hiatal) hernia is a protrusion of an organ into the diaphragm which is the muscle separating the chest from the abdomen; that most hiatus hernias are acquired and not congenital; that small hiatus hernias are more apt to produce symptoms than large ones; and that an ulcer in a hiatus hernia is more likely to be a congestive phenomenon in the hernia itself than to be related to emotional strain. Dr. Mensh further testified in part as follows:
Q. Would a person who had the symptoms that the Plaintiff had or which you found and which you recorded, in your opinion, be as capable of operating a piece of mechanical equipment as one who did not have that condition ?
A. I think he would be physically capable. I don’t know whether or not he wouldn’t though, develop a great number of symptoms due to his basic physical problem. He still could do it but he might have a great deal of symptoms referable to it, if we consider physical exertion will increase the frequency with which his symptoms would occur with his stomach.
Q. And would the increase in these symptoms in any way preclude 'his doing as much work as another?
A. I think this is definitely possible.
Q. Is it probable ?<
A. Yes, I think it is probable.
* * * * *
Q,. Doctor, do you think the Plaintiff had an ulcer in the hiatal hernia at the time of his separation from active duty ?
A. I have no way of knowing whether he did or didn’t. I think it is impossible clinically to tell whether a patient who has a symptomatic hiatal hernia has in conjunction an ulcer in the hernia. I don’t think you can differentiate the two, so I don’t know whether he did or did not. I don’t know whether he had an ulcer in the hernial sac in the first place.
*766 Q. So, we understand a man can have a hiatal hernia and not an ulcer; is that correct ?
A. Yes.
Q. And he can have an ulcer and not have a hernia ?
A. That is true. And he can have both.
21. (a) At the trial defendant produced the expert testimony of Colonel Herbert W. Coone,[1] United States Air Force, Medical Corps, a Flight Surgeon and Consultant in Internal Medicine to the Surgeon General, Air Force. Dr. Coone is a Diplómate of the American Board of Internal Medicine, certified in the specialty of Internal Medicine, a Diplómate of the National Board of Medical Examiners, a Fellow of the American College of Physicians, and a member of the American Medical Association, the Aero Space Medical Association, and the American Heart Association. At the time of plaintiff’s release from active duty on April 13, 1950, Dr. Coone was stationed at Wright-Patterson Air Force Base, Dayton, Ohio, serving as Chief of Medical Service at the Air Force Hospital.
(b) Dr. Coone testified that he examined plaintiff on April 10,1950, and made a final diagnosis of one hiatus hernia, small; that hospitalization was not indicated because there were no indications of complicating illness or injuries warranting such hospitalization; that there was no reasonable question as to plaintiff’s fitness for service; that an appearance before a Physical Evaluation Board was not indicated; that plaintiff was fit to perform the duties of his office, rank, grade or rating; and that if plaintiff had not been reported for separation, he (Dr. Coone) would have found him fit for retention on active duty. Dr. Coone further testified in part as follows:
Q. Doctor, the medical records from the Veterans Administration that are in evidence in this case reveal that on X-ray an ulcer was suspected in the case of Plaintiff’s hiatal hernia, and the Veterans Administration records further show in this case that this was not confirmed on the esophagoscopy examination. Now, based on those two propositions that I have stated to you, *767 would you state your medical opinion concerning the possibility] of an ulcer in this case ?
A. Haying reviewed the records and the reports of the gastrointestinal X-rays and esophagostrophy, [sic] it is my opinion that serious doubt exists as to whether an ulcer ever existed in the duodenum, in the lesser curvature of the stomach, or in the hiatal hernia. This is based on our experience that an isolated finding of an “ulcer” is open to question unless it is confirmed, is even more open to question in the absence of the clinical picture which is compatible with the finding of the “ulcer.”
Eadiologists commonly do better on the second examination than on the first examination in the diagnosis of ulcer of the intestinal tract.
In this case the radiologist not only did not confirm his previous findings but found something new, and each examination turned up a different or no finding. Such observations make me reluctant to accept the statement that the patient had an ulcer within the hiatus hernia.
Esophagostrophy] [sic] and radiologic examination in combination will increase the likelihood of demonstrating the finding of an ulcer within a hiatus hernia. Such is not the experience in this case.
Commissioner: Doctor, there is one phase of your testimony here that I would like to have you elaborate on just a bit for my enlightenment, and I assume eventually for the enlightenment of the Court.
As I understand your testimony, it is that it was your opinion when you examined the Plaintiff in April 1950 that he was fit to perform duties of his office, or, conversely, that he was not unfit to perform duties of his office. Tell us, please, sir, what was the basis for your conclusion. What criteria or standards did you use in arriving at that conclusion ?
The Witness: The standards that I used are my own experience as a military medical officer. At that time I had been commissioned twelve years so that my estimate of the man’s ability to perform service was based on a knowledge of the conditions under which he would be expected to do duty, was based on my experience with the decisions of other military medical officers in the Army and Air Force in arriving at the decision of fitness or unfitness. It is based on my experience as a member of medical boards concerned with determining fitness.
As related to the individual case, I took note of the man’s history as he gave it, reviewed the medical rec *768 ords which were available to me at that time, including the examination for separation, and concluded that the man had been performing duties since 1946 or 1947 with recurring symptoms of the type that he mentioned when I examined the patient in 1950.
Further, I took note of the fact that the patient’s symptoms had improved since one distressful factor had been removed, namely, divorce. I further took note of the fact that although he had multiple emotional stresses that no evidence of organic disease had developed which would render him unfit for military service.
By Mr. Southmayd:
Q. Now, Doctor, this answer you have just given, is this based on well-established medical principles?
A. Yes, sir.
* * * * *
Q,. Now, Doctor, I want to refer you to Joint Exhibit No. 7, and you recall my showing you these exhibits heretofore ?
A. Yes, sir.
Q. So, I again want to refer you to Joint Exhibit No. 7, to the last page, which is the hospital and clinical records of the Veterans Administration.
Doctor, I want to direct your attention to the statement under “Hospital Course and Treatment,” wherein it is stated:
“The nature of the patient’s symptomatology suggested a functional origin or at least a marked functional origin or at least a marked functional overlay of his symptoms.”
Now, as to a marked functional overlay of his symptoms, what is meant by that, medically ?
A. Medically speaking, a functional overlay refers to the emotional stresses and sources of tension which manifest themselves in numerous fashions in a patient’s complaints and at times in objective, observable physical findings.
The record shows that the patient has undergone numerous emotional stresses of a continuing nature, for example, in my own record of 10 April 1950 the patient revealed that he had serious domestic problems eventuating in a recent divorce. The functional relationship was supported by his statement that he suffered considerably from “nerves” and insomnia since January 1947, these symptoms improving since divorce.
Additionally my record described a sterilization on the 4th of March 1950. This constitutes, to most indi *769 ■viduals, a serious psychologic stress of a continuing nature. Additionally, the patient had been performing duty up to the time that he received word that his services were no longer required. This additionally constitutes a source of emotional stress and tension.
The subsequent records from the YA indicate a continuing pattern of this sort.
In addition to that it is my belief that the patient’s exaggerated concern for his hiatus hernia has in itself been a functional stress. His search for new employment during the two years following separation from service is part of the emotional and physical readjustment that a patient must make.
I believe I have made it clear that the patient had numerous reasons for developing functional overlay and that as a consequence the physician must be wary of interpreting the significance of transitory findings on X-ray or esophagostrophy [sic].
22. (a) Defendant also produced the expert testimony of Lieutenant Colonel John C. Holliday, a Doctor of Medicine in the Physical Standards Division of the Office of the Surgeon General. Dr. Holliday is a member of the American Medical Association and of the Aero Space Medical Association. He has published research in the field of neurohistology and in the field of human physiology. He served a number of years as a Flight Surgeon in the Army Air Corps.
(b) Dr. Holliday testified at length concerning the standards used by the Department of the Air Force at the time of plaintiff’s relief from active duty in 1950. He stated in essence that in 1950, although the Air Force had no published physical standards for disability retirement,[2] there was a “Manual for Officers In The Disposition and Ketiring Board Branch of The Physical Standards Division of The Surgeon General’s Office” which had been developed in the Office of the Army Surgeon General; that the manual set forth certain standards to be used in adjudicating applications for retirement on grounds of physical disability; and that the manual was used by the Air Force Surgeon General’s Office as an informal guide and was issued to the Physical Evaluation *770 Boards to try to keep uniformity amongst disability retirement cases. The manual reads in pertinent part :
Tbe following are some of the diseases, injuries and infirmities when present only in a mild degree which are considered as an insufficient reason for retirement or for finding an officer incapacitated for general military service: Psychoneurosis, (anxiety, including hypochon-driasis) hysteria; mixed neurasthenia; neurocirculatory asthenia; obsessive compulsive; (psychasthenia); reactive depression; hypertension; arteriosclerosis ^arthritis; sacroiliac strain; dermatitis; allergic manifestations (except asthma); angina pectoris; heart block; arrhythmia ; tachycardia; bronchitis; choroiditis; retinitis; kera-titis ; gastritis; emphysema; pyelonephritis; and pyelitis, [p- 10]
* * * * *
12. Cardiospasm and Pylorospasm, per se, are not considered as sufficient reason for retirement or finding an officer incapacitated for general service. Belladonna or some other medication should be used before the X-rays are taken to get relaxation of the spasm and to rule out ulcer or some growth, deformity or scar. [p. 11]
* * * * *
22. Hernia umbilical and ventral when small are not incapacitating for general service. Umbilical, ventral when large and post-operative may be remediable by surgery. Abdominal or chest operations are not compulsory if officer refuses. On the other hand, if they are correctible they are not permanent and, therefore, not a sufficient reason for retirement. If operation is contraindicated by other reasons as physical disability, the hernia may be found incapacitating for active service. Inguinal and femoral hernias, even though recurrent are considered not incapacitating for active service, as they are all correctible by surgery. Hernia of the muscle is usually considered correctible by surgery. Hernia of the diaphragm is very often correctible by surgery.
* * * * *
24. Ulcer peptic (gastric and duodenal) when present is incapacitating for any type of military service. When the ulcer heals and there is no scar or deformity by x-ray, the ulcer diathesis will not be considered a sufficient reason for retirement or for finding the officer incapacitated for active service. In such cases a 6 months’ period of temporary limited service within the continental limits *771 should be recommended with reexamination and reevaluation at the expiration of such period. When an officer has had an ulcer confirmed by x-ray prior to E AD, commissioned status, and then gets an exacerbation of his ulcer while on active duty, the ulcer will not be considered as permanently aggravated by the service unless one of the following conditions exist: (1) obstruction, (2) perforation, or (S) after prolonged hospitalization on medication and ulcer regime the symptoms and x-ray evidence of active ulcer persist.
(c) Dr. Holliday stated that he had examined plaintiff’s medical records; that an esophageal hernia is a hernia of the diaphragm, which is a projection of the viscus through the diaphragm; and that in April 1950, plaintiff would have been qualified for full flying duty with waiver by the Surgeon General. He further testified in part:
Q. At what time in his career would you fix the development or the manifestation of his condition which would lead you to say he should have a waiver after that time?
A. Well, it would have been after Colonel Coone’s examination. There would not be any reason for examination because Colonel Wood was doing full duty and, apparently, according to his record could do duty, so there has been no hospitalization, he wasn’t a constant sick book rider, his commander had no reason to believe he was unfit. Until that examination he could have gone on for the next twenty years with no waiver.
23. (a) In 1947 the Army Air Corps became the United States Air Force, but in accordance with Air Force Regulation certain Army regulations were applicable to the Air Force.
(b) At the time of plaintiff’s relief from active duty on April 13, 1950, the below quoted provisions from regulations were in effect and applicable to the Air Force[3]:
(1) Air Force Regulation 160-1, dated April 14, 1949, *772 entitled “Medical Service. Standards of Medical Examination for Flying” reading in part:
Pae. 1. Purpose. These regulations prescribe the physical standards for participation in regular and frequent aerial flights.
Pak. 2. Scope
a. These regulations apply to the medical examination given to — ■
*****
(2) Individuals holding aeronautical ratings.
(3) Individuals ordered by proper authority to participate regularly and frequently in aerial flights.
b. All individuals to whom these regulations apply must meet the basic requirements as provided in Alt 40-100 and AE 40-105.
(2) Air Force Eegulation 21-10, dated June 8,1949, reading in part:
3. Organization and Eesponsibility
a. General Order No. 35, 8 June 1949, establishes the Oflice of the Surgeon General, USAF.
(3) Air Force Eegulation 35-49, dated November 1,1949, entitled “MILITAEY PEESONNEL, Physical Evaluation, Hospitalization, Disability Eetirement, and Disability Discharge,” reading in part:
Other DEFINITIONS
Physically unfit or unfit—
Physical inability to perform the duties of the office, rank, grade, or rating held, which are required during the performance of full military duty, field as well as garrison, in both peace and war.
Physical disability—
The term used to describe the condition which renders a member unfit. A physical disability may consist of one or several physical defects which create a condition rendering the member unfit.
Duties of office, rank, grade, or rating—
The duties of the particular office, rank, grade, or rating which are required in the performance of full military duty, field as well as garrison, in both peace and war. The term “rating” as used herein is synonymous *773 with rank or grade, and does not refer to an aeronautical rating.
(4) Army Regulations 140-5, dated June 17, 1941, entitled “Officers’ Reserve Corps,” reading in part:
10. Physical examinations. — a. Of whom, required.— Except where otherwise expressly provided, every applicant for appointment in the Officers’ Reserve Corps, and every Reserve Officer qualifying for reappointment, retention, promotion, transfer, or active duty, as well as extensions of tour thereof, and upon relief from active duty, will be required to pass satisfactorily a physical examination of the scope prescribed by current War Department instructions.
b. Standards. — The physical standards will be those prescribed in AR 40-100 and 40-105, and in addition for the Air Corps in AR 40-110, supplemented by current War Department instructions.
(5) Army Regulations 40-100, dated April 8, 1946, entitled “MEDICAL DEPARTMENT, Miscellaneous Physical Examinations,” reading in part:
c. All cases in which there is disagreement among the medical officers responsible for the terminal physical examination, or in which the individual claims disability from defects not considered of incapacitating character by the examining board, will be referred for decision to a medical review board. A medical review board will be appointed by the commanding officer of the post, camp, or station at which the examination is held and will consist of not less than three medical officers. * * *
$ $ $ 3* ‡
7. Limited service standards of officers and warrant officers for original appointment and extended active duty. — a. In periods of national emergency, individuals may be accepted for original appointment or extended active duty who do not meet the physical standards for general military service but who are physically qualified for limited military service.
b. The following conditions are listed as an aid to uniformity in determining the physical qualifications of officers and warrant officers for original appointment or extended active duty in a limited service status:
(1) Acceptable for limited service.
*774 (n) Hernia, small and asymptomatic, umbilical, femoral, or nonscrotal inguinal.
* * * * #
(2) Nonacceptable for limited service.
# ^ H* Hi *
(m) Substantiated history of gastric or duodenal ulcer, or diagnosis of same by usual laboratory procedures.
Ht H« Hi Hi *
PáR. 16. Types of physical examination. — a. Final type examination.
(1) Definition.- — A thorough and complete physical examination performed for the determination of physical status and classification.
H: Hi ❖ * *
(3) When accomplished. — On all applicants for appointment as officers and warrant officers prior to appointment, physical reclassification, entrance upon or termination of active duty, permanent promotion, resignation, discharge or dismissal * * *
Hi Hi ❖ Hi Hi
(5) By whom accomplished; signatures. — Final type physical examinations will be accomplished only at authorized final type examining stations by a regularly constituted final type examining board composed of three or more Medical Corps officers. All completed forms will be signed by three Medical Corps officers who are members of the examining board.
(6) Army Regulations 40-105, dated October 29, 1946, entitled “Medical Department, Standards of Physical Examination for Commission or Warrant in Regular Army, National Guard of United States, Army of United States and Organized Reserves,” reading in part:
Section VIII. Mouth, nose, fauces, pharynx, LARYNX, TRACHEA, AND ESOPHAGUS.
Hi ❖ H? H« H«
Par. 27. Conditions which are causes for rejection.—
Hi Hi * # *
r. Diverticulum, ulceration, stricture, or pronounced dilation of the esophagus.
‡ $ H= ‡ #
Section XIV. Abdomen
Par. 40. Conditions which are causes for rejection.—
a. Wounds, injuries, cicatrices, or weakness of muscles *775 of the abdominal walls sufficient to interfere with function.
ijí Hí ❖ % ' ❖
c. Hernia of any variety, other than small umbilical.
d. Chronic diseases of the stomach or intestines.
e. Gastric or duodenal ulcer or history of gastric or duodenal ulcer with or without operation.
f. History of gastroenterostomy, ■ gastric resection, resection of peptic ulcer * * *.
(7) Army Regulations 40-1025, dated December 12,1944, entitled “Medical Department, Records and Reports of Sick and Wounded,” reading in part:
63. Line of duty for disease or injury. —
* * * * *
b. Basic provision for determining line of duty. — A disease or injury, that a militarized person contracts or sustains, while in the active military service of the United States, will be presumed to have been incurred in line of duty, unless there is substantial evidence to show that such disease or injury—
* * * * *
(4) Existed prior to the individual’s current active service and was not aggravated by the service (g below).
c. General inference. — Lacking evidence to the contrary, a disease or injury of a militarized person will be presumed to have been service-connected, and, therefore, in line of duty. * * *
* * * * *
g.Existed prior to individual’s current active service and was not aggravated by service (EPTS).
* * * * *
(2) Basic provision. — Irrespective of length of service, an Army patient will be presumed to have been in sound condition, upon entering active service, unless the disease or injury, or the conditions which brought about the disease, injury, or death, were noted on the patient’s physical examination upon entrance into the service, or unless clear and unmistakable evidence ((3) below) demonstrates that the injury or disease, or the conditions which caused the disease, injury, or death, though not noted, existed prior to the patient’s active service. Further, even if the existence of the condition prior to entering active service has been established, only specific findings of “natural progress” of the disease or injury, based on well-established medical principles, are able *776 to overcome the presumption of service-aggravated ((4) below). This provision will serve as a basis for judging line of duty in all cases, on or after 7 December 1941, and before the termination of hostilities incident to the present war * * *.
(B) Clear and unmistakable evidence. — Medical judgment alone, as distinguished from well-established medical principles, will not be considered sufficient to rebut the presumption of the patient’s sound condition at the time of his entrance into active military service. * * *
(4) Service-aggravated. — Any increase in disability during active service resulting from a condition that existed prior to active service will be presumed to have been service-aggravated, unless it can be proved otherwise on the bases of well-established medical principles. * * * advancement of such conditions as peptic ulcer, * * * can be expected to have been caused by exertion, exposure or other adverse influence of the military service. * * *
24. (a) Plaintiff alleges, among other things, that “under the regulations, [he] was in law physically unfit, or incapacitated, at the time of his release.” [4] [Emphasis added.]
(b) Plaintiff also alleges, among other things that he was “in fact physically unfit, or incapacitated, at the time of his release.” [Emphasis added.] Solely with reference to this latter allegation it is found that the evidence does not establish that the action of the Air Force Board for the Correction of Military Records in denying plaintiff’s request that his release from active duty be changed to disability retirement was arbitrary, capricious or not supported by substantial evidence.[5]
*777 CONCLUSION OJ? LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.

 Although In plaintiff’s requested findings the good faith of Colonel Coone is questioned and he Is alleged by plaintiff to be “on trial,” it is clear both from the evidence and from the demeanor of Colonel Coone as a witness that his good faith is not subject to question.

 As appears in Finding 23(b), the Air Force did apply Army Regulations which had been published and which contained physical standards for disability retirement.

 At pretrial, trial and post-trial conferences tie parties were in disagreement respecting which of several Army regulations were applicable to the Air Force. The disagreement stems principally from the fact that the Air Force, after it ceased to be the Army Air Corps, adopted certain Army regulations which the Army had repealed. The position is taken in this report that since after 1947 the Air Force became an entity separate from the Army it could (and did) adopt and apply language for its regulations, even though such language may not have been pant of then existing Army regulations.

 Plaintiff’s position is, in substance, that the regulations which contain the conditions which are causes for rejection (for example, hernia of any variety, other than small umbilical) require that a subject having any such condition be declared unfit by reason of physical disability to perform the duties of his office. Defendant’s position, on the other hand, is that even though a subject may have such a condition the medical officers are vested with discretion to determine whether or not the subject is unfit.

 Plaintiff has produced little testimony to the effect that plaintiff was in fact physically unfit to perform the duties of his office at the time of his release. The major testimony bearing on this factual issue was the testimony of defendant’s expert witnesses to the effect that plaintiff was not physically unfit to perform the duties of Ids office at the time of his release.